STATE EX REL. WILSON, RELATOR, *v.* WEIR ET AL., RESPONDENTS.

(No. 7,810.)

(Submitted April 2, 1937. Decided May 7, 1938.)

[79 Pac. (2d) 305.]

*Mr. William H. Clarke,* for Relator, submitted a brief, and argued the cause orally.

*Mr. Phil G. Greenan,* County Attorney of Cascade County, for Respondents, submitted a brief, and he and *Mr. John G. Brown,* of Counsel, argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, submitted a brief as *Amicus Curiae; Mr. Mark H. Derr,* Assistant Attorney General, and *Mr. Clarence Hanley,* Special Assistant Attorney General and Counsel for the State Board of Public Welfare, argued the cause orally.

*Mr. Einar Stromnes, Amicus Curiae,* appearing in behalf of Workmen's Protective Union No. 8, of Great Falls, Montana, argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original application for a writ of mandate. Its purpose is to compel the respondent board of county commissioners to pay to relator by warrant or check relief awarded to him under Chapter 82, Laws of 1937. The facts from which the controversy arose are these:

Relator, a citizen of the United States and a resident of Cascade county for more than four years, applied for general relief under Chapter 82. He was granted assistance under Part II of the Act. Instead of issuing to him a warrant or check, he was placed in an institution in Cascade county known as County Poor Farm No. 2. He appealed to the County Welfare Board, but it declined to change his form of relief. That board in its order stated: "Mr. Wilson was receiving relief in accordance with the plans outlined by the County Public Welfare Board, That the board did not consider the set-up illegal but in conformity with established rules of procedure, (2) and that cash could not be furnished as money was not available against which to issue the warrants, (3) that Mr. Wilson was receiving the same relief as other recipients in similar circumstances." Thereupon this proceeding was instituted here.

The only question presented is whether, under existing laws, the board of county commissioners, or the County Welfare Board, has any discretion with reference to the form or manner in which it may administer relief to the needy.

Section V of Part II of Chapter 82 provides: "All relief disbursements by the county or state departments to relief recipients shall be by warrant or check representing cash on demand, provided however that if there is evidence to prove that the recipient is in the habit of dissipating the relief allowance instead of using it for the purpose intended, cash relief will be discontinued to such person and the relief allowance will be given in the form of disbursing orders." And section XII, Part II, in part provides: " * * * As heretofore provided in this part, relief disbursements made by the county depart-

ment to relief recipients shall be by warrant or check, payable from either the county or state funds, as available or as provided.''

There is here no contention that relator has ever dissipated relief allowances made in cash so as to come within the latter part of section V. Respondents contend that by other provisions of Chapter 82 they have discretion in choosing the kind or form of relief which they may award.

Section X of Part I of the Act empowers the County Board of Public Welfare to establish ''local policies and such rules and regulations as are necessary to govern the county department and local administration of public welfare activities except that all such policies and rules and regulations must be in conformity with general policies and rules and regulations established by the state board.''

Section XI of Part I provides: ''The county department of public assistance shall be charged with the local administration of all forms of public assistance and welfare operations in the county including general relief, old age assistance, aid to dependent children, aid to needy blind and child protection and welfare, except that all such local administration must conform to federal and state law and the rules and regulations as established by the state board.''

It is plain from sections X and XI, Part I, that policies which may be established, and rules and regulations which may be adopted, must conform to, and not be inconsistent with, positive provisions of the statute. A similar restriction is placed upon the state board. (Subdiv. (c), sec. III, Part I.) The power to establish policies and to promulgate rules and regulations does not empower the board to change the form of relief which the legislature has prescribed.

Respondent board also asserts that it was acting properly in declining to issue warrants or checks, since the poor fund against which they would be drawn was exhausted. This does not furnish a reason for declining to issue warrants or checks (*State ex rel. Hart* v. *Gleeson,* 189 Wash. 292, 64 Pac. (2d) 1023; *State ex rel. Robbins* v. *Scofield,* 184 Wash. 270, 50 Pac. (2d)

1022; *Ladd & Bush* v. *Siegmund,* 153 Or. 471, 57 Pac. (2d) 395), unless they would entail tax levies prohibited by the Constitution (*State ex rel. Boxberger* v. *Burns,* 132 Neb. 31, 270 N. W. 656). Here no such question arises as that in the *Burns Case,* for under Chapter 82, when the available revenue of the county is exhausted, assistance shall be paid from the state welfare fund. (Subd. (b), sec. XI, Part I.)

It is further contended that mandamus is not the proper remedy, because relator has not exhausted his remedy by appeal to the State Welfare Board. Section XII, Part I of the Act, provides:

"If an application for assistance under this Act is not acted upon by the county department within a reasonable time after the filing of the application, or is denied in whole or in part, or if any award of assistance is modified or cancelled under any provision of this Act, the applicant or recipient may appeal to the state department in the manner and form prescribed by the state department. The state department shall, upon receipt of such an appeal, give the applicant or recipient reasonable notice and opportunity for a fair hearing.

"The state department may also, upon its own motion, review any decision of a county department, and may consider any application upon which a decision has not been made by the county department within a reasonable time. The state department may make such additional investigation as it may deem necessary, and shall make such decision as to the granting of assistance and the amount of assistance to be granted the applicant as in its opinion is justified and in conformity with the provisions of this Act.

"In the case of the state department reviewing a county decision on its own motion, applicants or recipients affected by such decisions of the state department shall, upon request, be given reasonable notice and opportunity for a fair hearing by the state department.

"All decisions of the state department shall be final and shall be binding upon the county involved and shall be complied with by the county department."

Section IV of Part II provides: "All persons seeking public assistance from relief funds are hereby guaranteed the right of appeal to either the county public welfare board or the state public welfare department, or both. Individuals or committees with complaints or grievances shall be given a fair and impartial hearing by either the county board or the state department and it shall be required that due consideration shall be given all proven facts presented by such individuals or committees and the county board or the state department shall be required to relief [relieve?] such situations, if not otherwise prohibited by law and to the extent of funds available."

Here all the fact questions upon which relator's right to relief depended were decided by the county board in his favor. There was then no object or purpose in him taking an appeal to the state board. When the facts were found in his favor entitling him to relief, the law made it the mandatory duty of respondents to pay it by warrant or check. (*State ex rel. Hart* v. *Gleeson*, supra.) And failure to discharge the clear, legal duty gave rise to the right to proceed by mandamus. (Sec. 9848, Rev. Codes.) This court is committed to the rule that where an appeal is provided for by law to an administrative board or body from the ruling of an inferior administrative body, an appeal to such administrative body or board is not always a condition precedent to the right to resort to the courts for relief. (*McBride* v. *School District*, 88 Mont. 110, 290 Pac. 252.)

The suggestion is made that it is not within the power of ▉ the state legislature to dictate to the counties how they shall spend their money, or how they shall care for their poor. The legislative control over counties is supreme, except in so far as it is restricted by the Constitution in express terms or by necessary implication. (*Hersey* v. *Neilson*, 47 Mont. 132, 131 Pac. 30, Ann. Cas. 1914C, 963; *Stange* v. *Esval*, 67 Mont. 301, 215 Pac. 807; *Heckman* v. *Custer County*, 70 Mont. 84, 223 Pac. 916; *Yellowstone Packing & Provision Co.* v. *Hays*, 83 Mont. 1, 268 Pac. 555.) The difference between counties and municipal corporations in this respect was pointed out in *State*

*ex rel. City of Missoula* v. *Holmes,* 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581.

Section 5 of Article X of the Constitution provides: "The several counties of the state shall provide as may be prescribed by law for those inhabitants, who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society." The words "as may be prescribed by law," as used in this section, mean as may be prescribed by Act of the legislative assembly.

While the duty to care for the poor is primarily an obligation of the counties, the state is free to offer co-operation and assistance. (*Mills* v. *State Board of Equalization,* 97 Mont. 13, 33 Pac. (2d) 563; *State ex rel. Normile* v. *Cooney,* 100 Mont. 391, 47 Pac. (2d) 637.) The legislature has the right to make provisions, binding upon the counties, as to how they shall care for their poor, even though this involves the right to dictate to the counties concerning expenditures of their own funds.

In 15 C. J. 581, it is stated: "The revenues of a county are not the property of the county in the sense in which the revenue of a private person or corporation is regarded. A county being a public corporation existing only for public purposes connected with the administration of a state government, its revenue is subject to the control of the legislature, and when the legislature directs the application of a revenue to a particular purpose, or its payment to any party, a duty is imposed and an obligation created on the county. So, too, where the legislature expressly designates a particular mode of raising funds for a certain purpose, all other modes are excluded." This rule is supported by so many authorities and is so well established that further citation of authorities would be superfluous. Among the more recent cases, however, in which the rule is announced and followed, may be cited the following: *County of Stark* v. *County of Henry,* 326 Ill. 525, 158 N. E. 116, 54 A. L. R. 777; *Montgomery* v. *State,* 228 Ala. 296, 153 So. 394; *City of Fremont* v. *Dodge County,* 130 Neb. 856, 266 N. W. 771; *Newman* v. *Schlarb,* 184 Wash. 147, 50 Pac. (2d) 36.

It is suggested that if counties may be compelled by the legislature to pay relief claimants by warrant or check, then this amounts to a levy of taxes by the legislature for a county purpose, contrary to section 4 of Article XII of the Montana Constitution. This suggestion is without foundation. There is no direct tax attempted to be levied by the legislature. The fact that the county must expend money which, but for the enactment of Chapter 82, it would not expend, does not bring Chapter 82 in conflict with section 4 of Article XII. (*State ex rel. City of Missoula* v. *Holmes,* supra.)

It is true that subdivision (b) of section XI of Part I of Chapter 82 makes it the duty of the board of county commissioners to levy the six mills required by law for the poor fund. But the fair import of that entire paragraph is that it prescribes the six-mill levy as the minimum requirement in order to place the county in a situation to obtain financial aid from the state, if needed. The levy is not the result of coercion or duress on the part of the legislature, but rests upon the choice of the county that it might place itself in line to receive aid from the state in caring for its poor. The situation is on a parallel with action by the states in the form of legislative enactment induced in order to obtain federal grants, and these have been held to be without coercion. (*Steward Machine Co.* v. *Davis,* 301 U. S. 548, 57 Sup. Ct. 883, 81 L. Ed. 1279, 109 A. L. R. 1293.)

It is argued that, since Chapter 82 does not expressly repeal sections 4521 et seq., Revised Codes, relating to the care of the poor, those sections are still in force and effect and place the exclusive supervision of the poor in the hands of the county commissioners. We recognize and approve of the rule that repeals by implication are not favored. However, if the last Act is in conflict with a prior law on the same subject, the last one controls and works an implied repeal, and this even though the legislature does not see fit to either expressly repeal it, or even to expressly state that the last Act repeals all Acts or parts of Acts in conflict with the latter.

A casual comparison of Chapter 82 with sections 4521 et seq. will demonstrate that at least some of the former are in conflict with the latter. We need not here point out these conflicts; it is sufficient for the disposition of this case to point out that by Chapter 82 the "entire and exclusive superintendence of the poor" is no longer vested in the board of county commissioners as it was under section 4521. The burden of caring for the poor and needy has assumed such proportion that the state and federal governments now co-operate with the counties in these matters.

Since, under the plain language of section V, Part II of Chapter 82, relief recipients shall "be [paid] by warrant or check," relator has the right to enforce the duty by mandamus. It is our duty to declare the law as it is written, and not attempt to write what the court may consider a better and more workable law. Our province is to construe laws and declare their meaning. In the enactment of them we have neither duty nor responsibility.

The writ will issue as prayed for. This court finds that respondents have defended this proceeding in good faith, and that relator is entitled to his costs and damages occasioned by the proceeding, including a reasonable attorney's fee. The court will retain jurisdiction of the proceeding to determine the amount of costs and damages, inclusive of attorney's fee, which may be included in a cost bill.

Associate Justices Stewart and Anderson concur.

Mr. Chief Justice Sands, being prevented by illness from giving the questions presented proper consideration, takes no part in the above decision.

Mr. Justice Morris:

I dissent. A more complete statement of the facts than is given in the majority opinion I deem essential to a comprehensive grasp of the questions involved.

Petition for a writ of mandate to compel the board of county commissioners of Cascade county to pay relief awarded relator by warrant or check. The affidavit for the writ recites section V, Part II of Chapter 82, Laws of 1937, which provides as follows: "All relief disbursements by the county or state departments to relief recipients shall be by warrant or checks representing cash on demand, provided however that if there is evidence to prove that the recipient is in the habit of dissipating the relief allowance instead of using it for the purpose intended, cash relief will be discontinued to such person and the relief allowance will be given in the form of disbursing orders."

It is then alleged that the relator is a citizen of the United States, a resident of Cascade county, and in need of food, shelter, and clothing; that he is not in need of institutional care because of any physical or mental affliction; that there is no evidence of his dissipation of relief allowance; that he applied to the County Welfare Board, his case was investigated, and his application for relief approved as provided by law; that he requested relief be granted by warrant or cash, which the county board refused, and instead placed affiant in County Poor House No. 2, and the board has repeatedly denied his requests for relief by cash or warrant, and that such refusal will be persisted in unless an order of this court compels the board to grant relator the relief in the manner prayed for; that application has been made to this court for the reason that the action of the county board has resulted in relator's "great damage and injury" and "he is destitute and in acute distress and in need of prompt and immediate relief"; that if the action were started in the district court, relator would have no means of support "pending the hearing of a long drawn out case, nor funds to prosecute such an action," and that he has no speedy and adequate remedy at law.

An alternative writ of mandate was issued as prayed for, returnable April 2, 1938, at which time relator and the county board appeared by counsel. The department of the Attorney General was also represented, and other parties were granted

the right to intervene. Extended arguments were heard, the board filed its answer, briefs were submitted, and the matter was taken under advisement by the court.

The answer of the board admits all of relator's allegations of fact, but denies his conclusions as to his rights being invaded, and on the contrary alleges that the board, acting within its discretion, denied relator's request for relief in cash or its equivalent for the reasons: That the county funds out of which relief is paid are depleted, and relator was adequately cared for by the means provided by the county for indigent persons resident in the county; that the regular budget of $76,980 produced from taxation by the county, and an emergency fund of $35,000, and $53,000 obtained from the State Department of Public Welfare, had been exhausted and the county had no funds from which relief in cash or by warrant could be supplied; that the county board had provided a residence where single persons were furnished with the necessaries of life, and that relator was by such means being supplied with more adequate relief than if he were paid $23.50 in cash, the amount fixed by the state board in such cases; that inspection by the county and state officials had shown the place where relator was being cared for to be clean and appropriate for such purposes. The board prays that the writ be denied and the proceeding dismissed.

No question arises here about the right of the relator to relief from Cascade county. He applied for relief, it was awarded to and accepted by him, and he admits such to be the facts, but contends that the relief supplied is not such as he is entitled to by law. To determine the merits of this contention a number of other questions must be considered.

Counsel for the department of the Attorney General and counsel for the intervener in the main support the contention of the relator that Chapter 82 of the Laws of 1937 repeals Chapter 347, comprising sections 4521 to 4541, inclusive, of the Revised Codes, relating to the poor, by implication. Statutes are removed from the statute books in this state in three ways: (1) By express repeal by the legislature; (2) by this court hold-

ing a statute to be in conflict with the Constitution, and therefore void; (3) by a decision of this court holding a later enactment to be in irreconcilable conflict with on older Act and the latter being repealed by implication.

The power to enact laws and the power to expressly repeal them is vested exclusively in the legislative department; the power to declare an Act of the legislature unconstitutional, or to declare an Act repealed by implication, is vested solely in the courts. We are here concerned with repeal by implication only. The exercise of this power by the courts, along with the exercise of the court's power of statutory construction, has given rise to the expression "judicial legislation," which implies, of course, that the courts have encroached upon the powers of the legislative department.

The power of implied repeal is a dangerous power that must be exercised with the utmost caution. The necessity for its exercise arises by reason of the fact that courts must determine what the law is. (Sec. 10699, Rev. Codes.) If, after diligent research, an Act of the legislature is found to be in conflict with the Constitution, the courts must hold the Act void. Likewise, if an older Act of the legislature is found to be in irreconcilable conflict with a later Act, the old, if the new be constitutional, must be held to have been repealed by reason of the implied intention of the legislature.

This court has repeatedly held that repeal by implication is not favored. (*State ex rel. Normile* v. *Cooney,* 100 Mont. 391, 47 Pac. (2d) 637; *Box* v. *Duncan,* 98 Mont. 216, 36 Pac. (2d) 986; *State ex rel. Nagle* v. *Leader Co.,* 97 Mont. 586, 37 Pac. (2d) 561; *State ex rel. Malott* v. *Board of County Commrs.,* 89 Mont. 37, 296 Pac. 1; *Nichols* v. *School District,* 87 Mont. 181, 287 Pac. 624; *London Guaranty Co.* v. *Industrial Acc. Board,* 82 Mont. 304, 266 Pac. 1103; *Ex parte Naegele,* 70 Mont. 129, 224 Pac. 269.) But if two legislative enactments relating to the same subject matter are in conflict and cannot be harmonized, the Act last enacted controls. (*State* v. *Miller,* 69 Mont. 1, 220 Pac. 97.) And under such circumstances the courts should not hesitate to declare a repeal by implication. (*Ex parte Naegele,*

supra.) However, before a statute will be held repealed by implication, there must be a plain and irreconcilable conflict between the old and the new. (*Box* v. *Duncan,* supra.)

On careful analysis I think that the alleged conflict between Chapter 82 of the 1937 Laws, and Chapter 347, Revised Codes, is apparent only, and that the two can be reconciled, and it is the plain duty of the court to reconcile them, if possible. At the outset it may be conceded that some of the needy and afflicted whose care has heretofore been assumed by the counties have been taken over by the state under the obligations imposed upon the state by section 1 of Article X of the Constitution, and to that extent the provisions of Chapter 347, Revised Codes, have been rendered inoperative.

In construing a statute for the purpose of reconciling it with another, the constitutionality of neither being in question, legislative intention controls, and such intention is determined by the purpose of the particular Act. (Sec. 10520, Rev. Codes; *McNair* v. *School Dist. No. 1, Cascade County,* 87 Mont. 423, 288 Pac. 188, 69 A. L. R. 866.) The court must construe a statute so as to effectuate the purpose of the legislature. (*Barney* v. *Board of Railroad Commrs.,* 93 Mont. 115, 17 Pac. (2d) 82, and many others.) What was the purpose of the legislature in enacting Chapter 82?

First, it must be kept in mind that many of the features of Chapter 82 were adopted to conform to the social security legislation of the federal government. (42 U. S. C. A., secs. 301 et seq.) The provisions of the Acts of both the federal and state governments were, in a large measure and in so far as they relate to the care of the poor, enacted to meet the grave emergency of unemployment. These features of the legislation were never intended to be permanent, but to maintain only so long as the necessity of caring for the idle remained; the unemployed had become such a horde that the local agencies of the several states—the counties—that branch of state governments to which care of the poor and needy had theretofore universally been delegated, were financially unable successfully to cope with the situation. Many of the states were either unable or un-

willing to assist the counties, and agitation in Congress led to grants of federal funds; this method, along with the agitation for old age pensions, led to the formation of the Social Security Acts. In order for states to share in any distribution of the federal funds for such purposes, the states were required to enact certain legislation outlined by the federal officials.

Chapter 82 is the answer to the federal requirements. This Chapter repealed the Montana Relief Commission Act, Laws 1935, Chapter 109, and other early attempts theretofore made by our legislature to meet such requirements. I think no reasonable mind will disagree with the conclusion that some of the features of Chapter 82 were incorporated in that Act for the purpose of meeting an emergency, while others are clearly meant to be permanent; assistance awarded counties to aid in the care of the local poor is clearly an emergency feature. And again, no reasonable mind will contend that either the state or federal government intends to continue distributing funds to the counties when the time arrives when the counties are able to reassume the obligation of caring for their needy.

On the other hand, the title to Chapter 82 clearly expresses the intention that the state shall assume, in full, certain powers and duties relating to certain existing institutions in compliance with that obligation imposed upon the state by section 1 of Article X of the Constitution, to establish institutions ''for the benefit of the insane, blind, deaf and mute, soldiers' home, and such other institutions as the public good may require, * * * supported by the state in such a manner as may be prescribed by law.'' It is clear that these institutions are made affairs of the state, to be established and maintained at state expense, and with which the counties have nothing to do. It therefore appears clear that Chapter 82 deals with some matters strictly within the province of the state, and others that come within the combined duties of the state and the counties.

It should next be remembered that the Act of 1935, creating the Montana Relief Commission, set up in each county where aid was required an independent state agency to distribute relief funds appropriated by the state from state funds, and such

funds as were awarded to the state by the federal government for such purposes, and at the same time the several counties carried on such care of the poor as they were able to provide for without any interference by the Montana Relief Commission's agencies in any county. The two sources of relief were never in conflict; such relief as the counties could supply was provided in the usual way, and the state and federal funds distributed in any county were regarded as a distinct and independent source of relief with which the county authorities had nothing to do.

Such being the case, is it not the most reasonable and wisest course to presume that when the legislature enacted Chapter 82, as a substitute for the old Act, and made the county board ex-officio the County Welfare Board, the legislative intent was to utilize the board of county commissioners in place of the separate county relief agency provided under the old Act as a matter of economy in the distribution of state and federal funds in the several counties? The conclusion would appear inescapable. All the powers of the state board, provided by Chapter 82, over the county board exercised in the distribution of state and federal funds may be operated freely and are fully satisfied by leaving the distribution of relief funds produced from county taxation to the county.

It is of little importance, speaking generally, as to how relief is distributed to the relator, nor is it particularly important as to whether Chapter 347 of the Revised Codes be repealed or not, so long as explicit provisions of our Constitution are not ruthlessly swept aside in order to accomplish such purposes, and the home-rule powers of counties destroyed by a state board with dominant powers in local affairs.

It borders on the absurd to contend that section 4, Article XII, which prohibits the legislature from levying taxes upon the property or inhabitants of counties for county purposes, is not overridden by Chapter 82, if that Chapter be construed as directing that counties shall levy six mills and a poll tax to be expended under the supervision of a state board. The discretionary power of the county board in local affairs which sec-

tion 4 of Article XII was intended to protect, and which this court has never presumed to question unless abused, would be nullified if the construction of Chapter 82 contended for be accepted. It is by just such subtle distinctions that the wholesome restraining provisions of the Constitution are evaded and broken down.

Chapter 82 explicitly and with more than usual particularity repealed the following provisions of the 1935 Revised Codes: Sections 325 to 335, inclusive, relating to the creation of the Board of Charities and Reform; sections 335.1 to 335.45, inclusive, relating to the creation of the Montana Relief Commission; sections 10480 to 10487, inclusive, providing for Dependent Children and Mothers' Pensions; sections 2511 to 2514, inclusive, relating to Indigent Crippled Children and the Orthopedic Commission; sections 336 to 347, inclusive, relative to the Bureau of Child and Animal Protection, but made no reference to Chapter 347, relating to the poor.

The legislature is presumed to know the law—to know what Acts are on the statute books and in full force and effect, and I think this presumption has particular force here, for the reason that Chapter 82 deals with subjects closely related to relief and care of the poor, and is particularly explicit in enumerating kindred Acts which it repeals. I am confirmed in this conclusion by a review of pertinent constitutional provisions and statutes relating to the subjects here under consideration. Section 5 of Article X of the Constitution provides: "The several counties of the state shall provide as may be prescribed by law for those inhabitants, who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society." This provision was, it would appear, adopted as a reaffirmation of old territorial laws.

Section 1 of Chapter 50 of the old Bannack Statutes has the same wording as section 4521 of the present Codes, and is as follows: "The board of county commissioners are vested with entire and exclusive superintendence of the poor." This section first found in the old statutes was, along with others on the subject of the poor, later re-enacted as a part of the "Codified"

Statutes of 1871; again re-enacted as part of the Revised Statutes of 1879; again incorporated in the Compiled Statutes of 1887, and affirmed in substance by section 5 of Article X, quoted above. Upon the adoption of the Constitution, the legislature, in response to the solemn mandate of that instrument, again re-enacted old section 1 of Chapter 50 of the Bannack Statutes, and its wisdom has received the approval of all our lawmaking bodies throughout all our legislative history, and is now brought in question by the contention that it has been repealed by implication. If the legislative assembly of 1937 intended to effect its repeal by Chapter 82, it would, I think, have expressed that intention by plain language and relieved the court of the responsibility of exercising a power which we have repeatedly said is not favored.

Another provision of the Constitution strongly supports the conclusion that the legislature did not intend to repeal Chapter 347, Revised Codes. Section 1 of Article X provides: "Educational, reformatory and penal institutions, and those for the benefit of the insane, blind, deaf and mute, soldiers' home, and such other institutions as the public good may require, shall be established and supported by the state in such a manner as may be prescribed by law." Section 29 of Article III provides: "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." No express words appear anywhere in the Constitution relieving the state of the mandate expressed in section 1, Article X, nor relieving the counties of the mandate expressed in section 5 of the same Article, unless it be found in the two sections themselves.

It will be noted that specific mention is made in section 1 of many things the state shall do in the premises, and then adds, "and such other institutions as the public good may require." The establishment and maintenance of institutions only are mentioned. Nothing is said about caring for the poor. In section 5 the counties are not specifically commanded to establish institutions for the purpose therein specified, but are commanded to "provide" by law for those "who, by reason of age,

infirmity or misfortune," may have claims upon society. Here are two clear, unmistakable, and separate constitutional obligations imposed upon the state and the several counties, and the respective obligations of each may be carried out harmoniously by the reasonable construction of the provisions of Chapter 82.

In interpreting section 5, Article X, this court said in *Mills* v. *State Board of Equalization,* 97 Mont. 13, 23, 33 Pac. (2d) 563, 567: "When the framers of our Constitution by section 5 of Article X, made it the duty of counties to provide for the support and care of unfortunates, they did not thereby prohibit the legislature from likewise making provision whereby the state could assist in the care of these deserving persons." This decision holds, in substance, that the duty of caring for the poor is placed primarily upon the counties, but the state may *assist* the counties. This decision was followed in *State ex rel. Normile* v. *Cooney,* 100 Mont. 391, 47 Pac. (2d) 637.

Relator's contention that Chapter 347 is repealed by the conflicting provisions of Chapter 82, if upheld, would leave the care of the poor under the exclusive supervision of the State Department of Public Welfare, for the reason that the duty imposed by section 5, Article X of the Constitution, upon the counties to care for the poor and infirm, would be inoperative by reason of the fact that the legislative provision, Chapter 347, Revised Codes, for carrying that mandate of the Constitution into effect would be wiped out if Chapter 347 is held to be repealed by implication. This would result in the counties being required to levy six mills and a poll tax on the property and inhabitants of the counties to provide funds to care for the poor, but the county boards would have no power or supervision over the distribution of the funds derived from such levies and collections. Such an administration of the poor laws would effectually nullify the provisions of section 4, Article XII of the Constitution, which is as follows: "The legislative assembly shall not levy taxes upon the inhabitants or property in any county, city, town, or municipal corporation for county, town, or municipal purposes, but it may by law invest in the corporate authorities thereof powers to assess and collect taxes for such purposes."

This provision of the Constitution could have no other purpose than to vest in "corporate" authorities of the counties, towns, cities, and other municipal authorities the power to regulate their local affairs to the extent mentioned, free from the dictatorial powers of the legislative assembly, but to what purpose is this constitutional inhibition placed upon the legislature if the legislature may dictate to such "corporate authorities," which, according to relator's contention, it assumes to do by Chapter 82, as to how and in what manner the county may spend the funds derived from the levies made by the county authorities? The conclusion is inevitable: The county board retains its discretionary powers to distribute the funds derived from taxation which the Constitution provides that it only has the power to levy and collect. There is nothing, however, in the Constitution prohibiting the state from assisting the county.

If the county's ability breaks down and the state, or the federal government through the state, comes to the assistance of the county, well and good, and to the extent that state or federal funds are distributed through county agency, the state or federal government undoubtedly may dictate the mode and manner of such distribution, but neither the state nor the federal government may dictate to the executive head of the county government—the board of county commissioners—how or in what manner it shall grant relief to the poor or destitute when such relief is provided by funds produced from taxes levied upon the inhabitants or property within the county. To hold otherwise would be to assume that the legislative assembly intended by Chapter 82 to provide for a revolutionary departure from the principles of traditional American government—to take a long step towards abolishing local self-government. The county unit is too well established in our system of government to assume that there was any intention to uproot it or to impair its integrity. A recent amendment to the Constitution—section 8, Article XVI—, see Laws 1935, Chapter 102, assures the corporate entity of the county, and that alone is sufficient to indicate a clear intention that its powers shall be retained unimpaired.

As to the remedy sought by this proceeding: The rules governing the right to a writ of mandamus are so well established that they should be known to all. Whether the writ shall issue at any time or in any case is within the sound discretion of the courts. (Sec. 3, Art. VIII, Constitution of Montana.) Mandamus is an extraordinary remedy, not to be had merely for the asking, but to be obtained only where there is no plain, speedy, and adequate remedy at law. (*Stabler* v. *Porter*, 72 Mont. 62, 232 Pac. 187; *State ex rel. Larson* v. *District Court*, 78 Mont. 435, 254 Pac. 414; *State ex rel. County of Musselshell* v. *District Court*, 89 Mont. 531, 300 Pac. 235, 82 A. L. R. 1158.) The writ will not lie unless the relator has been denied a clear legal right (*State ex rel. City of Cut Bank* v. *McNamer*, 62 Mont. 490, 205 Pac. 951; *State ex rel. Peterson* v. *Peck*, 91 Mont. 5, 4 Pac. (2d) 1086; *Clark* v. *Bailey*, 99 Mont. 484, 44 Pac. (2d) 740); nor if there be doubt of its necessity or propriety (*State ex rel. School Dist. No. 29* v. *Cooney*, 102 Mont. 521, 59 Pac. (2d) 48).

Relator not only has a plain, speedy, and adequate remedy by appeal to the state board, but in addition it does not appear that he "has been denied a clear legal right," nor is the "necessity or propriety" of issuing the writ apparent. The conclusion must be that relator has a plain, speedy, and adequate remedy at law under section III, Part I of Chapter 82, by appeal to the state board, and mandamus will not lie.

In determining the rights of the relator on such appeal, however, the state board may review the decisions of the county board only as to the acts of the county board relative to the disbursement of such funds as are supplied to the county by the state out of state or federal funds available for such purposes. The state board has no jurisdiction over the county board in the distribution of county funds derived from taxes levied upon the inhabitants or property of the county.

The writ should be denied, and the proceeding dismissed.