STATE OF MONTANA, ex rel. HARDIE N. STRANDBERG, Relator and Respondent, v. STATE BOARD OF LAND COMMISSIONERS, et al., Defendants and Appellants.

No. 9577.

Submitted January 23, 1957. Decided February 14, 1957.

As Amended on Denial for Rehearing March 1, 1957.

307 Pac. (2d) 234.

Mr. Forrest H. Anderson, Atty. Gen., and Mr. William F. Crowley, Asst. Atty. Gen., for appellant.

Mr. Leif Erickson, Helena, Mr. John L. McKeon, Anaconda, and Mr. Jerrold R. Richards, Helena, for respondent.

Mr. Anderson, Mr. Crowley, Mr. McKeon and Mr. Erickson, Mr. Henry Loble and Mr. Olsen argued orally.

Messrs. Loble & Loble and Mr. Gene A. Picotte, Helena, Mr. Arnold H. Olsen, Helena, amica curiae.

MR. JUSTICE ANGSTMAN:

This action was brought to enjoin defendants from confirming and approving oil and gas leases on four separate tracts of state lands on the basis of a 16 2/3 per cent royalty.

The complaint alleges in substance that there were bids made on the lands calling for 16 2/3 per cent royalty and also bids calling for 12½ per cent royalty. There were separate bids on each of the four tracts of land. The bids in the aggregate were as follows: One bid was for a bonus of $39,040 and 16 2/3 per cent royalty, and the other for a bonus of $68,000 and 12½ per cent royalty. Thus it will be seen from the allegations of the complaint that the amount bid for a bonus increased as the royalty decreased, and conversely the amount bid as a bonus decreased as the royalty increased.

The court overruled a general demurrer to the complaint. Defendants elected to stand on the demurrer, suffered judgment to be entered against them, and have appealed from the judgment.

Relator, in contending that the leases are improper, relies on R.C.M. 1947, section 81-1704, as amended by chapter 61, Laws of 1951, which provides that in all oil and gas leases granted by the state there shall be reserved in addition to the rental a royalty in the oil and gas produced, and that such "royalty reservation shall be twelve and one-half per centum (12½ %) on gas, and twelve and one-half per centum (12½ %) on that portion of the average production of oil or casing-head gasoline for each producing well not exceeding 3,000 barrels for the calendar month."

Counsel for defendant board contend that the amendment to section 81-1704, which fixes the royalty at 12½ per cent, is unconstitutional. They rely on section 1 of article XVII of the Constitution which, after providing for the disposal of state lands, contains this limitation: "* * * and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such dis-

position, nor unless the full market value of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state.''

And counsel for the board contended that the vice of chapter 61 was accentuated by the passage of chapter 122, Laws of 1953, which authorized leases for as long as oil and gas were produced in paying quantities. Leases executed prior to the passage of chapter 122 were ''for a period not exceeding ten (10) years and as long thereafter during the term of twenty (20) years commencing with the date of such lease or leases, as oil or gas of commercial quality and in commercial quantity shall be produced from the land covered thereby.'' R.C.M. 1947, section 81-1702, subd. (2), before amendment in 1953. And the royalty reservation, ''shall not be less than twelve and one-half per cent (12½ %) of the whole thereof.'' Section 81-1704. And at the expiration of such leases the board was given authority to advertise the land for re-leasing to the highest responsible bidder. Section 81-1715:

There is much discussion in the briefs of counsel as to whether it is the legislature or the Land Board that must determine the method of ascertaining the market value of the state lands, or any interest therein, that is to be disposed of. The answer to this question is found in the Constitution.

Section 1, of article XVII, provides that the market value of the lands and any ''estate or interest therein'' upon its disposal shall be ''ascertained in such manner as may be provided by law.'' And while the Land Board has the control of the leasing and sale of the school lands of the state, it must do so ''under such regulations and restrictions as may be prescribed by law.'' Mont. Const. art. XI, section 4. The Enabling Act contains practically the same language. The words ''as may be prescribed by law'' means as may be provided by the Legislature. State ex rel. Wilson v. Weir, 106 Mont. 526, 79 Pac. (2d) 305, 308.

Thus it is seen that under our Constitution it is the Legislature and not the Land Board that must fix the rules governing

the sale and leasing of state land, and the method of arriving at the market value thereof.

There is no merit in the contention that under existing laws ▮ the full market value of the lands is not being obtained.

Before the passage of chapter 61, and ever since then, until the instant case arose, leases had been executed with a royalty reservation of 12½ per cent, and at the time of receiving the bids on the lands here involved other lands were offered for sale or lease on a royalty of 12½ per cent, and sales or leases were made on that basis. If the full market value was obtained for leases carrying a 12½ per cent royalty and running for a maximum of twenty years, then it is difficult to understand why at the end of the twenty-year period the market value automatically increases. In other words, the duration of the lease does not appear to have any relationship to the question of what royalty should be obtained in order to receive the full market value of the land.

As before noted, the bid carrying the royalty of 16 2/3 per cent submitted a bonus of only $39,040, whereas the one carrying a royalty of 12½ per cent submitted a bonus of $68,000. Which is the highest and best bid? No one can say for sure which is the highest bid in advance of drilling to ascertain whether the land has oil-bearing sands. It should be noted that eight wells out of nine, drilled for oil on an average throughout the country, are dry holes. Bulletin, American Association of Petroleum Geologists, Vol. 37, No. 6, Table III, page 1193. In the case of dry holes, whatever bonus is paid is in fact in excess of what develops to have been the actual market value of the estate or interest in the land for oil leasing purposes. If perchance some are sold or leased under the legislative method for less than what turns out to be the market value, the legislature was warranted in concluding that the plan as a whole would procure the market value as an average, and that the bonus from dry holes would offset the shortages, if any, on producing acreages. Of course if the Legislature acts arbitrarily, capriciously, fraudulently or without reason, then the courts might

intercede. Chapter 61, which fixed the royalty at 12½ per cent, was passed without a single dissenting vote in either house (H. J. 1951, page 163; S. J. 1951, page 347), and chapter 122, Laws of 1953, passed the House by a vote of 57 to 30 (H. J. 1953, page 152), and was passed by the Senate by a vote of 34 to 22 (S. J. 1953, page 340).

There is no basis for charging the Legislature with fraud, or that it had acted arbitrarily or capriciously or without reason in passing either act, and particularly chapter 61 which is the one under attack here. It was faced with a difficult situation. It had the duty of discharging two trusts in disposing of state lands.

The Constitution, as above stated, imposes upon the Legislature the obligation to obtain the full market value not only of the land but of every "estate or interest therein." When lands are leased on a rental basis there is a disposal of an estate or interest therein within the meaning of section 1, article XVII, of our Constitution. Rider v. Cooney, 94 Mont. 295, 23 Pac. (2d) 261. When oil lands are leased on a royalty basis and a cash bonus, as here, the bonus constitutes rental for an estate or interest in the land. State ex rel. Dickgraber v. Sheridan, 126 Mont. 447, 254 Pac. (2d) 390. Hence, the Legislature in leasing oil lands is under obligation to obtain the full market value of the estate or interest disposed of on a rental basis, as well as for the sale of the land itself, or the oil and gas in and under the land. There can be no sacrifice of the rental for additional royalty without, at the same time, violating section 1, of article XVII, as to the interest disposed of by renting.

Faced with this dilemma, the Legislature fixed 12½ per cent royalty as the value of the estate or interest sold, when the production does not exceed 3,000 barrels per month, and allowed the estate or interest leased on a rental or bonus basis to be made the subject of competitive bidding. When the Legislature fixed the 12½ per cent royalty, which was, and for many years had been, the prevailing rate throughout Montana, and which was also the rate used by the Federal Govern-

ment and by individuals and corporations generally, there can be no valid contention that it acted arbitrarily, fraudulently, capriciously or without reason or judgment.

We are not at liberty to strike down a legislative enactment simply because we think we might draft a better one. Likewise, if the legislative plan be faulty, the alternative plan proposed as a substitute would not correct the evil, even though we assume that the Board has authority to substitute a plan of its own, which it has not. At most it might be less objectionable, but it too would be faulty in some degree if the legislative plan be held to be so.

In other words, if 12½ per cent royalty as a maximum is illegal or unlawful, then so is 16 2/3 per cent, but, except for the difference in percentages of royalty to a lesser degree. If the contention of counsel for defendants be sound, then the only way to assure "market value" would be to have competitive bidding on the percentage of royalty without any bonus. But that plan would have its faults because under such a plan the state never would have had the $5,790,423.32 to distribute to the public schools involved in the case of State ex rel. Dickgraber v. Sheridan, supra, and the Constitution requiring full market value of the estate or interest disposed of on a rental or bonus basis would be violated. Of course if the law does not provide for obtaining the full market value of the lands then the good faith of the Legislature is a matter of no concern, but here it has not been shown that the legislative plan fails to obtain the full market value of the state lands sold or leased for oil and gas purposes.

There is no hard and fast rule that can be devised to obtain the full market value of lands for oil and gas purposes to the exclusion of all others.

Some discretion must necessarily be lodged in the Legislature in fixing the method of determining full market value, and if, and when, it determines by experience that one method is better than another it may in its discretion make a change. In other words, by holding that the present method ob-

tains the full market value of the lands, it is not to be understood that it is the exclusive method. This result necessarily follows from the speculative value of any given tract of land being disposed of for oil and gas purposes where no one knows for sure in advance of drilling whether the land has oil bearing sands or, if so, what amount of production can be expected.

The court was right in overruling the demurrer and in entering judgment for relator.

The judgment is affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICE CASTLES, concur.

MR. JUSTICE BOTTOMLY:

I dissent:

As I interpret chapter 61, Laws of 1951, and chapter 122, Laws of 1953, both are in conflict with the Constitution and the Ordinances of Montana, which is the fundamental law of this state.

The Enabling Act, approved February 22, 1889, specifically provides, by section 11, in part, "That all lands granted by this act shall-be disposed of *only at public sale* after advertising * * * ." Emphasis supplied.

Section 1, article XVII, Montana Constitution, requires that all lands of the state that have been granted to the state by Congress shall be public lands of the state, and shall be held in trust for the people, to be disposed of for the respective purposes for which they have been granted, and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, *nor unless the full market value of the estate or interest disposed of be paid or safely secured to the state.* This provision is mandatory. Mont. Const. art. III, section 29.

Under neither of the above-mentioned legislative acts of 1951 or 1953 is the full market value of the estate or interest of the school lands disposed of, secured to the State of Mon-

tana. The record shows that at public sale some bidders were willing to bid more than the statutory-restricted royalty reservation for the lease. Where the statute sets an arbitrary reservation of 12½ per cent royalty, and at public auction sale the fact that bidders are able, willing and bid 16 2/3 per cent royalty for the lease, demonstrates conclusively that the royalty provided by statute of 12½ per cent only is not the full market value of the state's interest being disposed of, nor can the full market value be correctly determined under said enacted laws.

It is only by free, open, unrestricted, competitive bidding at a public auction sale that the true value or full market value of the state's interest may be determined and realized. Compare State ex rel. Galen v. District Court, 42 Mont. 105, 117, 112 Pac. 706. While the power is left with the Legislature to enact laws for the regulation and restriction of leasing state lands, yet such laws must, in adopting restrictions and regulations for the purpose of leasing, clearly and unequivocally provide a system that will, without doubt or uncertainty, *secure* to the people of the state the full market value of these lands or any interest therein. Section 1, art. XVII, supra. This the Legislature has failed to do by enacting chapter 61, Laws of 1951, and chapter 122, Laws of 1953.

It has been urged that the case of State of Montana ex rel. Johnson v. State Board of Land Commissioners, 348 U. S. 961, 75 S. Ct. 524, 99 L. Ed. 750, settled this question, but there the Supreme Court only found, that on petition for writ of certiorari, R.C.M. 1947, section 81-1702 (2d), was not inconsistent with "federal law." The Supreme Court did not of course pass upon the question whether the statute was or was not in conflict with our Ordinance I or the provisions of the Constitution of Montana.

Section 11 of the Enabling Act has been amended by the Congress, giving the consent of the United States to the changing of the letter, word, spirit and intent of that section, and our Legislature purportedly and erroneously attempted to accept such amendments by proceeding to enact such legislation

as chapter 84, Laws of 1933, chapter 8, Laws of 1939, and chapter 18, Laws of 1949, without first submitting the proposed changes to the people of the State of Montana, as is required by the Montana Constitution, Ordinance I, supra, and the Enabling Act. Thus were the people of this state denied the right to either accept or reject the amendments proposed.

In this connection it should be pointed out that our State Constitution and Ordinance I, supra, was submitted to the people of Montana for approval or rejection and the same was approved and ratified by the people of Montana in a general election for that purpose on October 1, 1889.

Section sixth of Ordinance I, supra, contains the restriction on the legislative, the executive and the judicial departments of our state government as follows: "That the ordinances in this article *shall be irrevocable without the consent of the United States and the people of said State of Montana.*" Emphasis supplied.

All officers of our government, from the highest to the lowest, are creatures of the law and are legally and morally bound to obey it. It is the only supreme power in our republican system of government. Courts of justice are established not only to decide controversies between citizens, but also to decide controversies between citizens and their government. Compare United States v. Lee, 106 U.S. 196, 220, 1 S. Ct. 240, 27 L. Ed. 171. Any statute must yield to the fundamental law of the land. The Constitution does not yield to the statute.

The foregoing constitutional provision and the provisions of Ordinance I are limitations upon the power of disposal by the Legislature and are equally binding upon the executive and the judiciary. See In re Beck's Estate, 44 Mont. 561, 576, 121 Pac. 784, 1057.

Section seven of Ordinance I contains the trust agreement of the people of Montana that the lands so granted to our state under the Enabling Act are and were accepted *upon the terms and conditions* in the Enabling Act specifically provided. It is to be noted that ,while amendments to the Enabling Act have

been consented to by the United States, none of the so-called amendments of the Enabling Act have ever been submitted to the people of Montana for approval or rejection as made mandatory by section sixth of Ordinance I. The provisions of Ordinance I are in harmony with and do not conflict with any provision of our State Constitution, and are therefore binding upon the executive, legislative and judiciary, as are all other mandatory provisions of our Constitution. It will be noted that Ordinance I is unrestricted and is permanent, while Ordinance II is restricted by section 12 thereof.

The majority rule is that an ordinance such as Ordinance I, where permitted or required by an enabling act such as ours, when attached to and submitted to the people of a state together with the constitution for approval or rejection, when approved becomes a part of the basic, fundamental, and supreme law of this state. State ex rel. Thompson v. Kenney, 9 Mont. 223, 23 Pac. 733; Stewart v. Crosby, 15 Tex. 546, 548. The supreme law of the state is beyond the control of the legislature. 16 C.J.S., Constitutional Law, section 11, pages 63, 64.

It should be noted that the opinion in Thompson v. Kenney, supra, was written the next year after the Ordinances and Constitution were ratified by the people of Montana and the opinion in Stewart v. Crosby, supra, was promulgated a few years after Texas was admitted to the Union. The authors of those opinions were well aware of the meaning and intent of the provisions of the Ordinances and Constitution there involved.

There can be no question that a constitutional convention, assembled and acting as directed by an enabling act, for the purpose of framing a constitution and ordinances for a new state, has the inherent and unquestioned power and right to frame and adopt ordinances to be submitted with the constitution to the people for either ratification or rejection. The people of the state are the possessors of and the foundation of the supreme authority and power flowing with a sovereign people, and by such ordinances when so approved may and did by Ordinance I place beyond the control of the Legislature the

power and authority to modify, change and amend the Enabling Act without submitting the question to the people of the state. Section 1 of article III of our Constitution declares: "All political power is vested in and derived from the people; all government of right originates with the people; is founded upon their will only, and is instituted solely for the good of the whole."

Such an ordinance as Ordinance I herein discussed, being in dignity a part of our fundamental law, may not be ignored nor abrogated by legislative act any more than any of the other mandatory provisions of our Constitution may be ignored by the Legislature, the Executive or the Judiciary. The Ordinances were written by outstanding lawyers of the Constitutional Assembly, and then were submitted to and approved by the people. They were carefully prepared for the purpose of protecting and caring for the people's most valuable and sacred interests. Ordinance I was, and is, permanent and irrevocable until changed by the people of Montana. The language is simple, direct and certain; it needs no interpretation. If it had been intended that the people were surrendering this power to chang the terms of the Enabling Act to the will of their Legislature, it would have been so very easy to have said so, but the people did not so provide, but, on the contrary, the people did declare that this Ordinance *shall be irrevocable* without the consent of the people of the said State of Montana. This was the act of the sovereign people, framed by the people themselves for themselves. The people so acting constitute the highest legislative body. We think no reasonable conclusion can otherwise be reached. This court may not rightfully declare or hold that merely by nonuse or merely by implication the people surrendered a right so valuable to them that they expressed their intention in plain and vigorous terms as to the one and only method of giving their consent to any proposed change or changes. It should be noted that Ordinance I, which is a part of the fundamental law of Montana, is unique and it is differ-

ent in its terms and restrictions from any other ordinances or schedules adopted by other states.

It has been urged that it is a cumbersome and slow method in requiring the question to be submitted to the people. The short answer to all such arguments is that we operate under a constitutional form of government where haste, *fiat* or decree are not tolerated and expediency has no place in the interpretation of constitutional provisions of ordinances or of statutory acts. A provision of the Constitution or of Ordinance I may sleep but it may not be ignored.

For the foregoing reasons, in my opinion, no legislative act is valid which purports to accept or approve or operate under any proposed change or amendment of the Enabling Act approved February 22, 1889, until such contemplated change or amendment first has been duly and regularly submitted to the people of the State of Montana for their approval or rejection, as well as being approved by the Congress of the United States as is made mandatory by Ordinance I. Therefore chapter 61, Laws of 1951, and chapter 122, Laws of 1953, being in conflict with the Constitution of Montana and Ordinance I, supra, are void.

It is therefore my opinion that the judgment of the district court should be reversed; that the injunction heretofore issued be dissolved and that the action in the district court should be ordered dismissed.

MR. JUSTICE ADAIR:

I concur in the foregoing opinion by Mr. Justice Bottomly.