[S. F. No. 23682. Nov. 9, 1978.]

JAMES HAWKINS et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY
OF SAN FRANCISCO, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

M. Gerald Schwartzbach for Petitioners.

Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Assistant State Public Defender, and Ezra Hendon, Deputy State Public Defender, as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and Clifford K. Thompson, Jr., Deputy Attorneys General, for Real Party in Interest.

## Opinion

**MOSK, J.**—In this proceeding we consider the constitutionality of present California procedures for prosecution by grand jury indictment. Defendants were charged, in a multiple-count indictment returned by the San Francisco Grand Jury, with conspiracy (Pen. Code, § 182, subd. 4) and grand theft (Pen. Code, § 487, subd. 1); in addition, some of the defendants were individually charged with other offenses.

Defendants were arraigned, and each pleaded not guilty to all counts. Their motion for a dismissal or in the alternative for a postindictment preliminary hearing was in due course denied. Defendants seek a writ of mandate, asserting a right under the due process and equal protection clauses of the federal and state Constitutions to an adversarial preliminary hearing. We find it unnecessary to address the serious due process issue posed because we conclude that an accused is denied the equal protection of the laws guaranteed by article I, section 7, of the California

Constitution when prosecution is by indictment and he is deprived of a preliminary hearing and the concomitant rights which attach when prosecution is by information.

## I

It is undeniable that there is a considerable disparity in the procedural rights afforded defendants charged by the prosecutor by means of an information and defendants charged by the grand jury in an indictment.[1] The defendant accused by information "immediately becomes entitled to an impressive array of procedural rights, including a preliminary hearing before a neutral and legally knowledgeable magistrate, representation by retained or appointed counsel, the confrontation and cross-examination of hostile witnesses, and the opportunity to personally appear and affirmatively present exculpatory evidence. (Pen. Code, § 858 et seq.; *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867 [59 Cal.Rptr. 440, 428 P.2d 304].)" (*Johnson* v. *Superior Court* (1975) 15 Cal.3d 248, 256 [124 Cal.Rptr. 32, 539 P.2d 792] (conc. opn. by Mosk, J.).)

In vivid contrast, the indictment procedure omits *all* the above safeguards: the defendant has no right to appear or be represented by counsel, and consequently may not confront and cross-examine the witnesses against him, object to evidence introduced by the prosecutor, make legal arguments, or present evidence to explain or contradict the charge. Penal Code section 939.7 captures the spirit of the proceeding by declaring as a matter of law, "The grand jury is not required to hear evidence for the defendant . . . ." If he is called to testify, the defendant has no right to the presence of counsel, even though, because of the absolute secrecy surrounding grand jury proceedings, he may be completely unaware of the subject of inquiry or his position as a target witness.[2] This remarkable lack of even the most basic rights is compounded by the absence from the grand jury room of a neutral and detached magistrate, trained in the law, to rule on the admissibility of evidence and insure that the grand jury exercises its indicting function with proper regard for the independence and objectivity so necessary if it is to fulfill its purported role of protecting innocent citizens from unfounded accusations, even as

---

[1] These constitute the two methods of initiating a felony prosecution in California. (Cal. Const., art. I, § 14.)

[2] As one observer put it, a grand jury room with no judge present to protect unrepresented witnesses or prospective defendants is "a threatening physical environment;" it "possesses coercive characteristics that are analogous to a police interrogation room, which the court found to be inherently coercive in *Miranda.*" (Note, *Federal Grand Juries: The Plight of the Target Witness* (1977) 11 U.S.F. L.Rev. 672, 685.)

it proceeds against those who it has probable cause to believe have committed offenses.

The Attorney General recognizes, as he must, that vastly different procedures attend these alternative modes of prosecution, but maintains that such differences are "more apparent than real." This startling claim is premised on the availability to the accused of judicial review of the grand jury's probable cause determination. (Pen. Code, §§ 995, 999a.) The defendant in either case, it is urged, is entitled to a judicial determination that the evidence is sufficient to require trial.[3]

The foregoing argument depends on two erroneous assumptions. It assumes first that the only benefit derived by a defendant from an adversarial preliminary hearing lies in obtaining a judicial determination of probable cause. Yet whatever may be the Legislature's intent in establishing such a hearing, it serves a number of pragmatic functions for the accused. The United States Supreme Court catalogued some of them in *Coleman* v. *Alabama* (1970) 399 U.S. 1, 9-10 [26 L.Ed.2d 387, 396-397, 90 S.Ct. 1999], holding the Alabama preliminary hearing at issue therein to be "a 'critical stage' of the State's criminal process" at which the defendant had a right to "the guiding hand of counsel."[4] The court observed that a "skilled interrogation of witnesses by an experienced lawyer can fashion a vital impeachment tool for use in cross-examination of the State's witnesses at the trial, or preserve testimony favorable to the accused of a witness who does not appear at the trial." It went on to recognize the important discovery function served by an adversarial preliminary hearing; such a hearing will assuredly provide the defense with valuable information about the case against the accused, enhancing its ability to evaluate the desirability of entering a plea or to prepare for trial. The court also noted a less obvious advantage to the defendant accorded a preliminary hearing: his counsel may immediately argue before a judge on such matters as the necessity for an early psychiatric examination or setting bail.

---

[3]Simultaneously, and inconsistently, the Attorney General argues that the grand jury indicting function is not a critical stage in the criminal process, that it is merely investigative. We emphasize that we are not here concerned with the true investigative role of the grand jury. In that capacity—citizens probing into and exposing governmental ineptitude and inefficient practices—the grand jury serves a valuable and productive purpose.

[4]Although only four members of the court joined the opinion of the court on this issue, a fifth, Justice Black, agreed in his concurring opinion with the conclusion that a constitutional right to assistance of counsel obtained in the Alabama preliminary hearing.

These benefits to the defense which inhere in an adversarial preliminary hearing are either completely denied to a defendant charged in a secret, nonadversarial grand jury proceeding, or ultimately realized by such a defendant only to a limited extent. It cannot be seriously argued that an indicted defendant enjoys a comparable opportunity to discover the state's case and develop evidence because he later obtains a transcript of grand jury proceedings. (Pen. Code, §§ 938.1, 995a.) Such a transcript will invariably reflect only what the prosecuting attorney permits it to reflect; it is certainly no substitute for the possibility of developing further evidence through a probing cross-examination of prosecution witnesses —a possibility foreclosed with the denial of an adversarial proceeding. There is no other effective means for the defense to compel the cooperation of a hostile witness (see *People* v. *Municipal Court (Runyan)* (1978) 20 Cal.3d 523 [143 Cal.Rptr. 609, 574 P.2d 425]); in the unlikely event that all the prosecution witnesses agree to submit to defense interviews, the defense still must incur unnecessary expense and hardship which may be substantial.

The Attorney General further assumes, in asserting that the differences between indictment and information procedures are "more apparent than real," that the likelihood of a probable cause finding is substantially the same whether the screening function is performed by the grand jury with subsequent judicial review or by a magistrate at a preliminary hearing. This assumption reflects the idealistic concept that the grand jury is an independent body of citizens, standing as a buffer between the state and the individual and protecting the innocent from unfounded accusations of crime. Unfortunately, grand jury proceedings today are structured in a manner that renders fulfillment of the ideal unattainable.

The prosecuting attorney is typically in complete control of the total process in the grand jury room: he calls the witnesses, interprets the evidence, states and applies the law, and advises the grand jury on whether a crime has been committed. (See Judicial Council of Cal., Annual Rep. (1974) p. 58; Kranitz, *The Grand Jury: Past—Present—No Future* (1959) 24 Mo.L.Rev. 318, 328; Calkins, *Abolition of the Grand Jury Indictment in Illinois* (1966) U.Ill.L.F. 423, 431.) The grand jury is independent only in the sense that it is not formally attached to the prosecutor's office; though legally free to vote as they please, grand jurors virtually always assent to the recommendations of the prosecuting attorney, a fact borne out by available statistical and survey data. (See Morse, *A Survey of the Grand Jury System* (1931) 10 Ore.L.Rev. 101, 153-154, 304, 325-326; Note, *Some Aspects of the California Grand Jury*

*System* (1956) 8 Stan.L.Rev. 631, 653-654; Note, *Evaluating the Grand Jury's Role in a Dual System of Prosecution: An Iowa Case Study* (1972) 57 Iowa L.Rev. 1354, 1369.) Indeed, the fiction of grand jury independence is perhaps best demonstrated by the following fact to which the parties herein have stipulated: between January 1, 1974, and June 30, 1977, 235 cases were presented to the San Francisco Grand Jury and indictments were returned in all 235.

The pervasive prosecutorial influence reflected in such statistics has led an impressive array of commentators to endorse the sentiment expressed by United States District Judge William J. Campbell, a former prosecutor: "Today, the grand jury is the total captive of the prosecutor who, if he is candid, will concede that he can indict anybody, at any time, for almost anything, before any grand jury." (Campbell, *Eliminate the Grand Jury* (1973) 64 J.Crim.L. & C. 174.) Another distinguished federal jurist, Judge Marvin E. Frankel, put it this way: "The contemporary grand jury investigates only those whom the prosecutor asks to be investigated, and by and large indicts those whom the prosecutor wants to be indicted." (Frankel & Naftalis, The Grand Jury: An Institution on Trial (1977) p. 100.) (Also see Antell, *The Modern Grand Jury: Benighted Supergovernment* (1965) 51 A.B.A.J. 153, 154-155; Alexander & Portman, *Grand Jury Indictment Versus Prosecution by Information—An Equal Protection—Due Process Issue* (1974) 25 Hastings L.J. 997; Graham & Letwin, *The Preliminary Hearing in Los Angeles: Some Field Findings and Legal-Policy Observations* (1971) 18 UCLA L.Rev. 635, 680-681; Moley, *The Initiation of Criminal Prosecutions by Indictment or Information* (1931) 29 Mich.L.Rev. 403, 414-415, 430; Weinberg & Weinberg, *The Congressional Invitation to Avoid the Preliminary Hearing: An Analysis of Section 303 of the Federal Magistrates Act of 1968* (1969) 67 Mich.L.Rev. 1361, 1380; Meshbesher, *Right to Counsel Before Grand Jury* (1966) 41 F.R.D. 189, 189-190; Coates, *The Grand Jury, The Prosecutor's Puppet. Wasteful Nonsense of Criminal Jurisprudence* (1962) 33 Pa.B.A.Q. 311, 314-315; Comment, *The Illinois Constitution, Article I, Section 7—Seeking a Rational Determination of Probable Cause* (1975) 24 De Paul L.Rev. 559, 561-565; Note, *A Constitutional Right to Preliminary Hearings for All Pretrial Detainee's* [*sic*] (1974) 48 So.Cal.L.Rev. 158, 170-173; Boudin, *The Federal Grand Jury* (1972) 61 Geo.L.J. 1, 35; Shannon, *The Grand Jury: True Tribunal of the People or Administrative Agency of the Prosecutor?* (1972) 2 N.M.L.Rev. 141, 142; Foster, *Grand Jury Practice in the 1970's* (1971) 32 Ohio St.L.J. 701, 702; Schwartz, *Demythologizing the Historic Role of the Grand Jury* (1972) 10 Am.Crim.L.Rev. 701, 703; Tigar & Levy, *The Grand Jury as the New Inquisition* (1971) 50 Mich.St.B.J. 693,

694; Comment, *Federal Grand Jury Investigation of Political Dissidents* (1972) 7 Harv. Civ. Rights-Civ. Lib. L.Rev. 432, 438-443; Wise, *Criminal Law and Procedure* (1974) 20 Wayne L.Rev. 365, 377-378; Gerstein & Robinson, *Remedy for the Grand Jury: Retain but Reform* (1978) 64 A.B.A.J. 337, 340.) Justice Douglas put the matter succinctly when he wrote: "It is, indeed, common knowledge that the grand jury, having been conceived as a bulwark between the citizen and the Government, is now a tool of the Executive." (*United States* v. *Dionisio* (1972) 410 U.S. 1, 23 [35 L.Ed.2d 67, 82, 93 S.Ct. 764] (dis. opn.).)

The domination of grand jury proceedings by the prosecuting attorney no doubt derives at least in part from the grand jury's institutional schizophrenia: it is expected to serve two distinct and largely inconsistent functions—accuser and impartial factfinder. (See Comment, *The Preliminary Hearing Versus the Grand Jury Indictment: "Wasteful Nonsense of Criminal Jurisprudence" Revisited* (1974) 26 U.Fla.L.Rev. 825, 836-838, 842-843; Note, *Criminal Law—Grand Juries, Exemplars and Prosecutors* (1973) 22 De Paul L.Rev. 737, 749-750.) In one role, "Basically the grand jury is a law enforcement agency" (*United States* v. *Cleary* (2d Cir. 1959) 265 F.2d 459, 461, and cases cited), participating in the prosecutorial task of discovering criminal conduct and the perpetrators thereof; putting on its other hat, the grand jury is expected to be a neutral body, protective of the individual against prosecutorial abuses. It seems self-evident that to the extent it succeeds at one function it must fail at the other. Almost all observers of the system conclude that this conflict of roles has prevented the grand jury from being objective, generally to the detriment of indicted defendants.

The problem of excessive prosecutorial influence is not solved by the availability of judicial review, for the same lack of objectivity, however inadvertent, which affects the grand jurors when they vote to indict infects the record for purposes of review. Excluded from the grand jury room, the defense has no opportunity to conduct the searching cross-examination necessary to reveal flaws in the testimony of prosecution witnesses or to expose dubious eyewitness identifications.[5] This lack of defense participation in the development of the reviewable record creates a heavy bias in favor of a finding that the grand jury indictment was based on probable cause. For example, in *United States* v. *Boberg* (8th

---

[5]One advocate has described as follows the value of cross-examination: it "permits disclosure of contradictions, inconsistencies, unsupported conclusions, bizarre descriptions of events, favoritism in testimony, motive, bias, slanting of facts, absence of proof, and in some cases even perjury." (Werchick, Cal. Preparation and Trial (2d ed. 1974) § 14.5, p. 727.)

Cir. 1977) 565 F.2d 1059, the federal appellate court emphasized that the prosecutor's interrogation of the defendant as a witness before the grand jury consisted "almost entirely of leading questions," and the ensuing indictment rested on the defendant's "cryptic responses" to such questions. The court admonished that "This kind of interrogation always creates a great risk that the witness will misunderstand the questions or that the prosecutor will put words in the witness' mouth," and warned all prosecutors that it would "strictly scrutinize for fairness" any similar indictment obtained thereafter. (*Id.,* at pp. 1062-1063.)

It is clear from the foregoing that a defendant charged by indictment is seriously disadvantaged in contrast to a defendant charged by information. (See also Dash, *The Indicting Grand Jury: A Critical Stage?* (1972) 10 Am. Crim. L.Rev. 807, 814-815; Judicial Council of Cal., Annual Rep. (1974) pp. 47, 52-55.) Indeed, current indictment procedures create what can only be characterized as a prosecutor's Eden: he decides what evidence will be heard, how it is to be presented, and then advises the grand jury on its admissibility and legal significance. In sharp contrast are information procedures in which the defendant is entitled to an adversarial, judicial hearing that yields numerous protections, including a far more meaningful probable cause determination. Yet the prosecuting attorney is free in his completely unfettered discretion to choose which defendants will be charged by indictment rather than information and consequently which catalogue of rights, widely disparate though they may be, a defendant will receive. He may act out of what he believes to be proper law enforcement motives, or he may act whimsically; no case law or statutory guidelines exist to circumscribe his discretion. We examine below the constitutionality of permitting the prosecuting attorney to make such discriminatory classifications.

## II

■ Under the traditional two-tier test of equal protection, a discriminatory legislative classification that impairs fundamental rights will be subjected to strict scrutiny by the courts, and the state will be required to bear the heavy burden of proving not only that it has a compelling interest which justifies the classification but also that the discrimination is necessary to promote that interest. (See, e.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 761 [135 Cal.Rptr. 345, 557 P.2d 929], and cases cited.)

■ For the reasons stated in part I, *ante,* the denial of a postindictment preliminary hearing deprives the defendant of "such fundamental

rights as counsel, confrontation, the right to personally appear, the right to a hearing before a judicial officer, and the right to be free from unwarranted prosecution. These guarantees are expressly or impliedly grounded in both the state and federal Constitutions and must by any test be deemed 'fundamental.' " (*Johnson* v. *Superior Court* (1975) *supra,* 15 Cal.3d 248, 266 (conc. opn. by Mosk, J.).)

 The Attorney General fails to discharge his burden of proof under this test. His sole attempt to do so is to list in his brief a few tactical advantages gained by the prosecutor who chooses to use the indictment procedure.[6] But none of these reasons amounts to a constitutionally "compelling" state interest that justifies depriving an indicted defendant of the above-discussed fundamental rights guaranteed to him in a preliminary hearing. Nor, indeed, does the Attorney General make any effort to show that this discrimination is constitutionally "necessary" to preserve any such advantages.

 We conclude that the denial of a postindictment preliminary hearing deprived defendants herein of equal protection of the laws guaranteed by article I, section 7, of the California Constitution.[7]

## III

The appropriate remedy for the constitutionally infirm treatment of indicted defendants is not to eliminate or alter radically the general indicting function of the grand jury; indeed, that function is explicitly sanctioned in the California Constitution (art. I, §§ 14, 23) and specifically implemented by the Legislature (Pen. Code, § 888 et seq.). Until such time as the Legislature may prescribe other appropriate procedures, the remedy most consistent with the state Constitution as a whole and least intrusive on the Legislature's prerogative is simply to permit the

[6]"A prosecutor may proceed by indictment for valid reasons: the prospective defendant cannot be found; witnesses may fear testifying in court; the case may have potential for prejudicial pretrial publicity; publicity may jeopardize a continuing investigation; a preliminary examination may involve prolonged delay because of the number of defendants or the complexity of the case."

[7]While we held to the contrary in *People* v. *Sirhan* (1972) 7 Cal.3d 710, 746-747 [102 Cal.Rptr. 385, 497 P.2d 1121], the issue was treated cursorily and was neither argued nor decided in relation to the California Constitution. As we have previously stated, " '[I]n criminal actions, where life or liberty is at stake, courts should not adhere to precedents unjust to the accused. It is never too late to mend.' " (*People* v. *Aranda* (1965) 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265], quoting from *United States* v. *Delli Paoli* (2d Cir. 1956) 229 F.2d 319, 323 (dis. opn. of Frank, J.).) To the extent it is contrary to the views herein expressed, *Sirhan* is overruled.

indictment process to continue precisely as it has, but to recognize the right of indicted defendants to demand a postindictment preliminary hearing prior to or at the time of entering a plea. If the defendant makes a timely request for such a preliminary hearing, at the direction of the court the prosecuting attorney shall refile the indictment as a complaint, thus activating the procedures set forth in the Penal Code (see Pen. Code, § 859 et seq.).[8]

■ The state constitutional provision recognizing the grand jury's indicting function—article I, section 14—is no bar to our holding herein. It provides, "Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information." The term "law," of course, encompasses judicial decisions as well as legislative enactments. (Cf. Evid. Code, § 160.) Thus, while the Constitution authorizes the use of grand juries to indict criminal defendants, it leaves to the Legislature and the courts the task of developing procedures, consistent with other state constitutional provisions, for implementing that mode of initiating prosecutions.[9]

■ Because of previous reliance by the bench and bar on the validity of current postindictment procedures, the rule announced herein shall apply only to the present case and to those indicted defendants who have not entered a plea at the time this opinion becomes final. (See, e.g., *People* v. *Cook* (1978) 22 Cal.3d 67, 99, fn. 18 [148 Cal.Rptr. 605, 583 P.2d 130] and cases cited.)

---

[8]In *People* v. *Duncan* (1972) 388 Mich. 489 [201 N.W.2d 629], the Supreme Court of Michigan held that defendants are entitled to a postindictment preliminary hearing. As a result of *Duncan* the general procedure we recommend here was codified in Michigan Court Rule 788 and is now accepted practice in that state.

[9]Current section 14 represents a streamlined version, not intended to introduce substantive changes, of former article I, section 8, which provided: "Offenses heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a magistrate, or by indictment, with or without such examination and commitment, *as may be prescribed by law.*" (Italics added.) Plainly this predecessor section also left to the Legislature and the courts the task of formulating indictment procedures that do not diminish other constitutional guarantees.

The Attorney General argues that this court is without power to rule invalid indictment procedures, no matter how drastically or unreasonably such procedures may undermine other constitutional provisions. This position is remarkable in light of long-standing American principles recognizing the role of courts in a constitutional system. The principal support cited by the Attorney General is legislative history which is said to leave the development of indictment procedures to legislative control. Of course the Legislature in the first instance prescribes procedures for grand jury indictments; it is no revelation that history so provides. But the cited legislative history does not purport to strip California courts of the power to invalidate a scheme that interferes unreasonably—and unnecessarily—with other fundamental constitutional guarantees.

Let a peremptory writ of mandate issue directing the trial court to proceed in accordance with the views expressed herein.

Tobriner, J., Manuel, J., and Newman, J., concurred.

**MOSK, J.**—My opinion prepared for the court concludes that the current indictment procedures violate traditional standards of equal protection. I am, of course, in agreement with the majority of my colleagues on that issue.

Nevertheless I am taking the liberty of explaining why, if ours were not a collegial body and mine was the responsibility alone, I would apply a new and refined test. My diagnosis of the theoretic and pragmatic fallacies in the traditional two-tier test of equal protection suggests the need for adoption of .a third, or intermediate, test. As I shall discuss below, in my view the ultimate acceptance of an intermediate test is foreordained in Supreme Court opinions: the question is not whether, but when, the third test will become standard. I regret that our court has failed to forthrightly assume leadership among the states on this important question of constitutional law.

Before proceeding with additional discussion of the subject, I point out that it is not unprecedented for a justice to write a separate concurrence to an opinion of which he was the author for the court. (See, e.g., Justice Brennan's concurrence to the Brennan opinion for the court in *Abbate* v. *United States* (1959) 359 U.S. 187, 196 [3 L.Ed.2d 729, 735, 79 S.Ct. 666]; accord, *Wheeling Steel Corp.* v. *Glander* (1949) 337 U.S. 562, 576 [93 L.Ed. 1544, 1552, 69 S.Ct. 1291]. ("It cannot be suggested that in cases where the author is the mere instrument of the Court he must forego expression of his own convictions") (per Jackson, J.).)

I

We have consistently recognized that the principle of equal protection of the laws embodied in the California Constitution, though it does not absolutely bar the state from distinguishing between groups of individuals and treating them differently, requires that classifications be justified by legitimate state objectives. (See, e.g., *In re King* (1970) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983]; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].)

The United States Supreme Court, in applying the federal equal protection clause, has developed a two-tier analytical framework for reviewing legislative classifications. The less intensive standard of review requires only that the classification be rationally related to a legitimate state end. This standard, until recently at least, has proved in practice to be so deferential to legislative judgment that it has been aptly described as providing "minimal scrutiny in theory and virtually none in fact." (Gunther, *The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* (1972) 86 Harv.L.Rev. 1, 8 (hereinafter Gunther).) One federal judge has pithily concluded that this test means, "In other words, hands off." (*Vance v. United States* (N.D.Tex. 1977) 434 F.Supp. 826, 834, affd. *per curiam* (5th Cir. 1977) 565 F.2d 1214.) Such abdication of the power of judicial review is primarily a reaction—or overreaction—to what came to be perceived by the late 1930's as excessive judicial intervention on grounds of substantive due process. (See Wilkinson, *The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality* (1975) 61 Va.L.Rev. 945, 948 (hereinafter Wilkinson).)

Far more intensive review has characterized the "strict scrutiny" standard, which requires that classifications be necessary to achieve a compelling state interest. This test evolved subsequently to the rational basis standard; it derived from a concept that the denial of certain rights—so important that they are "fundamental"—and the use of certain classifications—so sensitive that they are "suspect"—are rarely, if ever, justified and require a much more stringent standard of review. (See Goodpaster, *The Constitution and Fundamental Rights* (1973) 15 Ariz.L. Rev. 479, 486-487 (hereinafter Goodpaster); Wilkinson, *supra,* at p. 945.) Application of the strict scrutiny test has yielded conclusions substantially different from those which result from the rational basis test: it has tended to provide scrutiny that has been " 'strict' in theory and fatal in fact." (Gunther, *supra,* at p. 8; see also Gellhorn & Hornby, *Constitutional Limitations on Admissions Procedures and Standards—Beyond Affirmative Action* (1974) 60 Va.L.Rev. 975, 986; Ackerman, *The Conclusive Presumption Shuffle* (1977) 125 U.Pa.L.Rev. 761, 774.)

The two-tier system of reviewing equal protection claims has been criticized by many thoughtful observers as a rigid and artificial analytical structure. Leading the assault has been Justice Thurgood Marshall, who has characterized the two-tier mode of analysis as "outdated and intellectually disingenuous." (*Beal v. Doe* (1977) 432 U.S. 438, 457 [53 L.Ed.2d 464, 479, 97 S.Ct. 2366] (dis. opn.).) Justice Marshall summarized his consistently expressed views in a dissent to the court's opinion in *San*

*Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 98-99 [36 L.Ed.2d 16, 80-81, 93 S.Ct. 1278]: "I must once more voice my disagreement with the Court's rigidified approach to equal protection analysis. See *Dandridge* v. *Williams,* 397 U.S. 471, 519-521 (1970) (dissenting opinion); *Richardson* v. *Belcher,* 404 U.S. 78, 90 (1971) (dissenting opinion). The Court apparently seeks to establish today that equal protection cases fall into one of two neat categories which dictate the appropriate standard of review—strict scrutiny or mere rationality. But this Court's decisions in the field of equal protection defy such easy categorization. A principled reading of what this Court has done reveals that it has applied a spectrum of standards in reviewing discrimination allegedly violative of the Equal Protection Clause. This spectrum clearly comprehends variations in the degree of care with which the Court will scrutinize particular classifications, depending, I believe, on the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." (See also *Massachusetts Bd. of Retirement* v. *Murgia* (1976) 427 U.S. 307, 318-321 [49 L.Ed.2d 520, 527-530, 96 S.Ct. 2562] (dis. opn. by Marshall, J.).) And Justice Marshall set forth his perception of the proper inquiry in his majority opinion, signed by six other justices, in *Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 95 [33 L.Ed.2d 212, 216, 92 S.Ct. 2286]: "As in all equal protection cases . . . the crucial question is whether there is an *appropriate governmental interest suitably furthered* by the differential treatment." (Italics added.)

Other judges and commentators have endorsed the view that the traditional framework for equal protection analysis is deficient in concept and frequently ignored in practice. Justice White did so explicitly in *Vlandis* v. *Kline* (1973) 412 U.S. 441, 458-459 [37 L.Ed.2d 63, 75-76, 93 S.Ct. 2230] (conc. opn.), and Justice Powell implicitly with his conspicuous avoidance of two-tier rhetoric in *Weber* v. *Aetna Casualty & Surety Co.* (1972) 406 U.S. 164, 172-173 [31 L.Ed.2d 768, 777-778, 92 S.Ct. 1400]. (See also Gunther, *supra*; Bennett, *Liberty, Equality, and Welfare Reform* (1973) 68 Nw.U.L.Rev. 74, 96; Gellhorn & Hornby, *op. cit. supra,* 60 Va.L.Rev. at pp. 986-988; Karst, *The Supreme Court, 1976 Term—Foreword: Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv.L.Rev. 1, 3; *Francis* v. *Cleland* (D.S.D. 1977) 433 F.Supp. 605, 618-619; *Hoover* v. *Meiklejohn* (D.Colo. 1977) 430 F.Supp. 164, 167-168; *Gilpin* v. *Kansas State High School Activities Assn., Inc.* (D.Kan. 1974) 377 F.Supp. 1233, 1238-1239; *McIlvaine* v. *Pennsylvania State Police* (1973) 454 Pa. 79 [309 A.2d 801, 807-811] (dis. opn.); *Schwartz* v. *Talmo* (1973) 295 Minn. 356 [205 N.W.2d 318, 324-325] (dis. opn.).)

In short, the vice of the traditional approach is that it applies either a standard that is virtually always met or one that is almost never satisfied. Professor Wilkinson observed that the attempt to apply "two widely variant levels of scrutiny with no gradations for rights of intermediate importance" must prove unsatisfactory "because, as Professor Freund once remarked, the world does not move on a 'binary principle.'" (Wilkinson, *supra,* at p. 948, fn. 15.)

The broad analytical lacuna thus remaining would be filled if an intermediate approach were adopted; it has not yet gained widespread acceptance, however, no doubt because of a hesitance to develop an unstructured standard that might appear to invite judicial intervention in policymaking preferably left to political agencies. But any court that is so inclined can perform simple legal legerdemain and reach a predetermined result by maneuvering such conclusory labels as "suspect" or "fundamental." Even the most responsible application of the traditional analysis inevitably involves a certain measure of judicial balancing, for the scope of such terms as "rational," "legitimate," "compelling," or "necessary" remains largely a matter of opinion. The tendency of courts to manipulate words and meanings to avoid the rigidity of the two-tier framework has prompted one commentator to write: "Working with due process and equal protection opinions dealing with fundamental rights is like playing [the croquet match in *Alice in Wonderland*] . . . , using concepts that bend or fall limp to chase words that move with a mind of their own into categories which just are not there any more. We quickly learn: this is not the game we thought we were playing." (Goodpaster, *supra,* at p. 479.)

In recent cases, the United States Supreme Court has apparently developed an intermediate level of review in response to "a perception that the all-or-nothing choice between minimum rationality and strict scrutiny ill-suits the broad range of situations arising under the equal protection clause, many of which are best dealt with neither through the virtual rubber-stamp of truly minimal review nor through the virtual death-blow of truly strict scrutiny, but through methods more sensitive to risks of injustice than the former and yet less blind to the needs of governmental flexibility than the latter." (Tribe, American Constitutional Law (1978) p. 1089 (hereinafter Tribe).) That equal protection standards are in a state of flux—and that a third standard of review is emerging—has been widely recognized. (See, e.g., *Acha* v. *Beame* (S.D.N.Y. 1977) 438 F.Supp. 70, 78; *Gay Students Org. of U. of New Hampshire* v. *Bonner* (D.N.H. 1974) 367 F.Supp. 1088, 1096-1097, affd. and mod. (1st Cir. 1974) 509 F.2d 652; Tribe, *supra,* at pp. 1082-1092; Simson, *A Method for*

*Analyzing Discriminatory Effects Under the Equal Protection Clause* (1977) 29 Stan.L.Rev. 663, 665-666; Wilkinson, *supra,* at pp. 951-953; Goodpaster, *supra,* at pp. 501-504; Ackerman, *op. cit. supra,* 125 U.Pa.L. Rev. at pp. 774-775; Karst, *op. cit. supra,* 91 Harv.L.Rev. at p. 23, fn. 122; Note, *A Question of Balance, Statutory Classifications Under the Equal Protection Clause* (1973) 26 Stan.L.Rev. 155, 157-160; Note, *The Supreme Court of California, 1972-1973* (1974) 62 Cal.L.Rev. 408, 462.)

The new standard, thus far most closely associated with discrimination based on classifications by gender or the status of illegitimacy, was clearly articulated in *Craig v. Boren* (1976) 429 U.S. 190, 197 [50 L.Ed.2d 397, 407, 97 S.Ct. 451]: "To withstand constitutional challenge . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." The vitality of "middle-level scrutiny" was subsequently confirmed when this language was quoted and the new standard applied in *Califano v. Goldfarb* (1977) 430 U.S. 199, 210-211 [51 L.Ed.2d 270, 279, 97 S.Ct. 1021], and *Califano v. Webster* (1977) 430 U.S. 313, 316-317 [51 L.Ed.2d 360, 363-365, 97 S.Ct. 1192].[1]

Justice Marshall's opinion for the court in *Zablocki v. Redhail* (1978) 434 U.S. 374 [54 L.Ed.2d 618, 98 S.Ct. 673], indicates the new intermediate mode of review may be more generally applied. The equal protection analysis there presented carefully avoided the two tiers of traditional review and focused instead on such factors as the importance of the rights involved, the extent to which the classification at issue interfered with their exercise, and the significance of the state interests advanced in support of the classification. The court concluded that the statutory classification could not "be justified by the interests advanced in support of it." (*Id.,* at p. 391 [54 L.Ed.2d at p. 633, 98 S.Ct. at p. 683].) Several other Supreme Court justices have accorded explicit recognition to the development of an intermediate level of review. In his dissenting opinion in *Craig v. Boren* (1976) *supra,* 429 U.S. 190, 218 [50 L.Ed.2d 397, 420], Justice Rehnquist observed that the court was applying an "elevated or 'intermediate' level scrutiny." Concurring in *Craig,* Justice Powell remarked that the court subjects gender-based classifications to "a more critical examination than is normally applied when 'fundamental' constitutional rights and 'suspect classes' are not present." (*Id.,* at p. 210 [50

---

[1]Several lower federal courts have also quoted and applied this test in cases involving gender-based discrimination. (*E.E.O.C. v. American Tel. & Tel. Co.* (3d Cir. 1977) 556 F.2d 167, 179; *Blake v. City of Los Angeles* (C.D.Cal. 1977) 435 F.Supp. 55, 60; *Hoover v. Meiklejohn* (D.Colo. 1977) *supra,* 430 F.Supp. 164, 168; *In re Paris Air Crash of March 3, 1974* (C.D.Cal. 1977) 427 F.Supp. 701, 708.)

L.Ed.2d at p. 415]; see also *id.,* at pp. 211-214 [50 L.Ed.2d at pp. 415-417] (conc. opn. by Stevens, J.).) Dissenting in *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 551 [52 L.Ed.2d 531, 569-570, 97 S.Ct. 1932], Justice White catalogued the *three* levels of review: strict scrutiny, "the somewhat less strict standard of *Craig* v. *Boren,*" and "the generally applicable standard" (the rational basis test).[2]

This court, in reviewing discriminatory classifications, has most often simply stated and applied the traditional test devised by the United States Supreme Court. (See, e.g., *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241].) We have not in any manner indicated, however, that we view the two-tier approach as the ultimate framework for equal protection analysis rather than merely a developmental stage in the evolution of appropriate standards for testing the constitutional sufficiency of legislative classifications. Indeed, in *Brown* v. *Merlo* (1973) *supra,* 8 Cal.3d 855, 861, the equal protection standard applied by Justice Tobriner, speaking for a unanimous court, was couched in terms of the formulation set forth in *Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251], with citations to *Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 446-447 [31 L.Ed.2d 349, 358, 92 S.Ct. 1029], and *Weber* v. *Aetna Casualty & Surety Co.* (1972) *supra,* 406 U.S. 164, 173 [31 L.Ed.2d 768, 777]—all cases which have been regarded as fashioning a new intermediate level of review. Moreover, we have exercised independence in our application of the state equal protection clause, finding rights to be fundamental (see, e.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 760-766 [135 Cal.Rptr. 345, 557 P.2d 929]) and classifications to be suspect (see, e.g., *id.; In re Antazo* (1970) *supra,* 3 Cal.3d 100, 112; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]) where the United States Supreme Court has declined to do so. We

---

[2]Many lower courts have also recognized explicitly that equal protection analysis now entails three levels of review. For instance, in *Hoover* v. *Meiklejohn* (D.Colo. 1977) *supra,* 430 F.Supp. 164, 168, the court understood the standard enunciated in *Craig* to constitute "a 'middle-tier approach,' requiring something between 'legitimate' and 'compelling,' viz., 'important,' and something more than a 'rational' relationship but less perhaps than 'strict scrutiny,' viz., 'substantially' related." (See *Meloon* v. *Helgemoe* (D.N.H. 1977) 436 F.Supp. 528, 530-532; *Meloon* v. *Helgemoe* (1st Cir. 1977) 564 F.2d 602, 604-605; *Vance* v. *United States* (N.D.Tex. 1977) *supra,* 434 F.Supp. 826, 833-834, affd. *per curiam* (5th Cir. 1977) 565 F.2d 1214; *Lewis* v. *Cohen* (E.D.Pa. 1976) 417 F.Supp. 1047, 1053; *Gilpin* v. *Kansas State High School Activities Assn., Inc.* (D.Kan. 1974) *supra,* 377 F.Supp. 1233, 1238-1239; see also Note, *The Supreme Court, 1976 Term* (1977) 91 Harv.L.Rev. 70, 177-182; Note, *Gender-Based Legislative Classifications* (1978) 57 Neb.L.Rev. 555, 559.) In *Francis* v. *Cleland* (D.S.D. 1977) *supra,* 433 F.Supp. 605, 618-620, the court noted that the new "medium level of review" has been applied in cases involving classifications which, though not suspect, came close to being suspect; the court concluded that such a middle-tier approach is likewise appropriate when a case involves a right not fundamental but which is close to being fundamental.

have thus demonstrated that "our state equal protection provisions, while 'substantially the equivalent of' the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." (*Serrano* v. *Priest, supra,* 18 Cal.3d at p. 764.)

For the foregoing reasons I urge that we refine our articulation of the standards for applying the state equal protection clause. As Professor Tribe put it, "there seems little likelihood that equal protection analysis will ever again be neatly separable into two dramatically polar forms of review . . . ." (Tribe, *supra,* at p. 1089.) In my view we should adopt a variation of the intermediate level of review discussed above, applicable when rights important—but not "fundamental"—are denied, or when a classification sensitive—but not "suspect"—is made. Such rights and bases of classification do not trigger strict scrutiny under traditional equal protection analysis, and should not do so; but neither is the weak rational basis standard adequate to test the constitutionality of measures which discriminatorily deny important rights or make classifications based on sensitive criteria.

When such rights or classifications are implicated, it is necessary to examine the importance of the state interests involved and the extent to which they are promoted. The proper inquiry is this: Does the classification *significantly* further *important* state interests? I recognize, of course, that the emphasized concepts are no more exact than those invoked in the traditional two-tier approach. But the existence of an intermediate level of scrutiny will give California courts the flexibility needed to adjust their analysis of equal protection claims to conform with reality. A standard of review formulated in this manner will allow our courts, for example, to consider such critical factors as "the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state interests in support of the classification." (*Dandridge* v. *Williams* (1970) *supra,* 397 U.S. 471, 521 [25 L.Ed.2d 491, 522-523] (dis. opn. by Marshall, J.).)

The adoption of an intermediate standard of review would not effect a dramatic change in the law of equal protection; it is, rather, substantially the same test the United States Supreme Court now applies regularly in gender discrimination cases, on the theory that gender-based classifications may not quite qualify as "suspect" but are the closest thing to it and thus deserve much more careful scrutiny than the weak rational basis test

provides. Use of a basis of classification so sensitive—though not suspect—requires inquiry into the importance of the state interests involved and the extent to which they are furthered. The discriminatory denial of rights not quite fundamental, but close to being fundamental, logically requires a similar inquiry. Thus Professor Tribe explained that "intermediate scrutiny has been triggered if important, though not necessarily 'fundamental' or 'preferred,' interests are at stake" or "if sensitive, although not necessarily suspect, criteria of classification are employed." (Tribe, *supra,* at pp. 1089-1090.)

It is argued in defense of the old system of review that the two-level test is reasonably simple to apply, in contrast to substantial difficulties of application forecast for the three-level test proposed herein. The relative simplicity of application of two-tier review, however, is a direct consequence of the glacial rigidity of that system. As noted above, fundamental rights and suspect classifications trigger a scrutiny so strict that invalidation of the legislative scheme is usually assured; all other rights and classifications are "tested" by "a largely meaningless requirement of rationality." (*Id.,* at p. 1089.) This wide chasm between levels of review is entirely unjustified, given the broad spectrum of rights and classifications that demand equal protection analysis.

Equally unpersuasive is the claim that two-tier review has proven effective because the lower standard, despite the minimal scrutiny it entails, has occasionally been used to strike down offending legislation. That the extremely deferential test may indeed suffice to invalidate invidiously discriminatory legislation within a very narrow ambit—those few cases involving legislation so arbitrary as to bear no rational relation to statutory purposes—does not establish the efficacy of two-tier analysis. That analysis is simply not capable of providing meaningful review of legislation which denies rights that are almost, but not quite, fundamental, or makes classifications almost, but not quite, suspect. Invariably such legislation will be upheld—if the test is applied honestly according to its terms—as long as some minor state interest is promoted in a marginal way, even though the rights denied are very important or the basis of classification is highly sensitive.

If on the other hand such legislation is invalidated under the two-tier test, it will be at the cost of distorting the rational basis standard either by denigrating the asserted state interest or by denying that the statute promotes that interest. Such "unadmitted but opportune inflation of the rational basis standard" thus masks a decisional process significantly different from the one purportedly applied. (Goodpaster, *supra,* at

pp. 503-504.) Far preferable is an analytical framework that need not be distorted—or ignored—in order to fairly evaluate equal protection claims.

It is such a framework that I urge we adopt. Introducing a third tier of review would merely extend a process that already occurs, although to a limited extent, under the old system of equal protection review. The concepts of fundamentality, rationality, and the necessity and compelling nature of state purposes require an assessment of the importance of rights and interests, the sensitivity of classifications, and the significance of the promotion of state concerns. The intermediate level of scrutiny focuses on the same factors, but permits a more refined and less rigid analysis.

It has been abundantly clear to the United States Supreme Court, which developed the third tier of analysis for application in cases involving discrimination based on gender or the status of illegitimacy, to the individual Supreme Court justices who have criticized the old equal protection mode of review and favored a more flexible process, and to the many distinguished commentators cited herein, that the carefully formulated three-tier system of review I propose does not inject intolerable uncertainties into equal protection analysis. Augmenting the old approach in this manner fills an analytical crevasse that has obstructed the reasonable resolution of competing interests in this sensitive area. In the second portion of this opinion I shall illustrate the operation of the intermediate level of analysis by applying it to the facts of the case at bar.

## II

Part I of the majority opinion enumerates the many rights granted under information procedures but denied under indictment procedures. As shown therein, the distinction has serious practical consequences for indicted defendants, causing them to receive a substantially less meaningful probable cause determination and a much inferior opportunity to prepare for trial. Such defendants are thus denied rights of sufficient importance to activate the intermediate level of review described above. We have previously recognized the "fundamental principle . . . that justice must be administered to all persons equally." (*In re Antazo* (1970) *supra,* 3 Cal.3d 100, 109.) The dedication of our constitutional system to affording equal justice compels us to examine closely the justifications asserted for the differential treatment of criminal defendants. (See *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814].)

The reasons usually given by prosecutors for choosing to initiate prosecutions by indictment include the following: indictment procedures (1) save time; (2) protect witnesses against embarrassing cross-examination; (3) protect an innocent accused when no indictment is returned; (4) protect the cover of an informant; (5) protect witnesses against harm or intimidation; (6) allow the prosecuting attorney to test his case and obtain a community viewpoint on its strength; (7) permit the evidentiary hearing to be held over an extended period of time; (8) facilitate investigations, e.g., by providing subpoena availability without the initiation of formal proceedings; (9) allow the prosecutor to toll the statute of limitations when the defendant is absent (Pen. Code, §§ 800, 803); (10) protect the defendant from prejudicial pretrial publicity; (11) protect society from the flight of the accused; and (12) permit the prosecuting attorney to share responsibility for the prosecution with the grand jury when there is great public interest in a case. (See Judicial Council of Cal., Annual Rep. (1974) pp. 47-51; Graham & Letwin, *The Preliminary Hearings in Los Angeles: Some Field Findings and Legal-Policy Observations* (1971) 18 UCLA L.Rev. 636, 679; Note, *Some Aspects of the California Grand Jury System* (1956) 8 Stan.L.Rev. 631, 644; Margolin & Arguimbau, *Post-Indictment Preliminary Hearings in California,* in Fourteenth Annual Defending Criminal Cases (P.L.I. 1976) p. 286.)

Many of the foregoing reasons for utilizing indictment procedures do indeed reflect legitimate state interests promoted by the availability of such procedures; but it is irrelevant to the issue before us that any interests are furthered *by the availability of indictment procedures.* Indicted defendants are disadvantaged not because of any irrevocable misfortune visited upon them during the course of grand jury proceedings; their disadvantage derives rather from the denial of the many important benefits that inhere in an adversary proceeding. The constitutional issue posed is whether indicted defendants may be denied the adversarial preliminary hearing afforded other defendants—not whether they may be indicted in the first instance. The proper focus of the inquiry, therefore, is whether important state interests are significantly furthered *by the denial of an adversary hearing.*

It is clear from an examination of the interests promoted by indictment procedures that, with two exceptions discussed below, none of such interests is enhanced in the slightest degree by the denial of a postindictment preliminary hearing. Thus the statute of limitations would still be tolled for absent defendants according to the provisions of Penal Code sections 800 and 803; the secrecy of grand jury proceedings would remain

intact, permitting the prosecutor to test his case or invoke the investigative powers of the grand jury, and protecting the accused when no indictment is returned; similarly, witnesses and informants would enjoy precisely the same protection with or without a postindictment preliminary hearing because their identities become known to the defendant upon return of the indictment and delivery to him of a transcript of the grand jury proceedings (Pen. Code, §§ 938.1, 995a); and the defendant could avert the threat of prejudicial pretrial publicity by waiving his right to a preliminary hearing or demanding that the public be excluded under the mandatory provisions of Penal Code section 868 (*People* v. *Elliot* (1960) 54 Cal.2d 498, 504 [6 Cal.Rptr. 753, 354 P.2d 225]). Because these interests are not significantly furthered—indeed, they are not furthered at all—by the denial of a preliminary hearing to indicted defendants, they do not justify such discriminatory treatment.

Only two of the reasons claimed by prosecutors for choosing to charge by indictment rather than information implicate interests that are promoted by the denial of a postindictment preliminary hearing. First, indictment procedures save time—particularly, as the Attorney General suggests, in complex cases when a preliminary hearing could be lengthy. The saving is realized, of course, because of the abbreviated process made possible by the discriminatory denial of adversary safeguards; whatever its origin, however, it is nonetheless a factor. Second, indictment procedures permit evidence to be heard over an extended period, thus facilitating the scheduling of appearances by witnesses.

The advantages of saving time and facilitating scheduling would concededly be diminished to the extent defendants were to demand a postindictment preliminary hearing. In addition, exercise of such a right would oblige the prosecuting attorney to repeat the same evidence when, for any of the other legitimate reasons listed above, he has elected to employ the grand jury indicting function. Thus, denial of the right to a postindictment preliminary hearing furthers the state's interests in administrative convenience and conservation of judicial resources. But as will appear, these interests are neither sufficiently important nor sufficiently promoted to justify depriving indicted defendants of the significant rights which attend adversary proceedings.

To begin with, the percentage of defendants charged by indictment is remarkably and consistently low. In the years 1968 through 1971, for example, only 3.9 percent of the felony filings in California were prosecuted by indictment (Cal. Dept. of Justice, Bureau of Crim. Stats.,

Crime and Delinquency in Cal. (1971) p. 42); further, the parties herein have stipulated that less than 3.5 percent of the cases prosecuted in the San Francisco Superior Court between June 30, 1973, and July 1, 1976, were initiated by indictment. The actual duplication of prosecutorial effort and administrative burden resulting from providing indicted defendants with a preliminary hearing would thus be minimal. The Attorney General may be correct in surmising that the relatively small number of indictments might yield a disproportionate increase in consumed court time because complex cases currently prosecuted by indictment would require relatively lengthy adversary hearings. This added burden would be offset to a large extent, however, because some indicted defendants would doubtless prefer to proceed to trial rather than undergo the delay of a subsequent preliminary hearing, and in other cases such hearings would likely yield a greater number of dismissals or guilty pleas as the parties would have a superior opportunity to appraise the relative strengths and weaknesses of their positions. Given the infrequent use of indictment procedures, it would not appear that the state interests in efficiency and convenience are substantially served.

More persuasive, however, is the insignificance of such interests relative to the important rights denied to indicted defendants. The Supreme Court has recently demonstrated the validity of Justice White's perception that "as the Court's assessment of the weight and value of the individual interest escalates, the less likely it is that mere administrative convenience and avoidance of hearings or investigations will be sufficient to justify what otherwise would appear to be irrational discriminations." (*Vlandis* v. *Kline* (1973) *supra,* 412 U.S. 441, 459 [37 L.Ed.2d 63, 75] (conc. opn.).) Applying its intermediate level of review in *Craig* v. *Boren* (1976) *supra,* 429 U.S. 190, the court pointedly observed that *Reed* v. *Reed* (1971) *supra,* 404 U.S. 71, and decisions following it "have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications." (429 U.S. at p. 198 [50 L.Ed.2d at p. 407]; see also *Hampton* v. *Mow Sun Wong* (1976) 426 U.S. 88, 115-116 [48 L.Ed.2d 495, 515-516, 96 S.Ct. 1895].) Similarly, such objectives are not sufficiently weighty to justify denying indicted defendants the right to have an evidentiary hearing before a judicial officer, to personally appear, to confront and cross-examine witnesses, to present evidence, and to be represented by counsel—particularly when the asserted convenience and efficiency are so minimally promoted.

I therefore agree that the denial to defendants herein of the adversarial preliminary hearing afforded defendants charged by information consti-

tutes an invidious discrimination in contravention of article I, section 7. of the California Constitution, but I would apply the equal protection analysis developed in this concurring opinion to reach such conclusion.

Newman, J., concurred.

**BIRD, C. J.**—I concur in the holding by the majority that traditional equal protection principles require that an individual accused by indictment of a public offense be afforded a post-indictment preliminary examination. I also agree with most of the discussion of my colleague, Justice Mosk, in part II of his concurring opinion. However, I am compelled to comment on those portions of Justice Mosk's concurrence in which he advocates the creation of an "intermediate level" of equal protection analysis under the California Constitution. (Conc. opn. of Mosk, J., *ante*, at p. 601.) I have grave doubts whether such an analytical device is sound as a general policy or necessary in view of this court's prior decisions.

An intermediate level of equal protection review raises some fundamental questions of constitutional theory and practicality. In the large majority of situations where it is invoked, the equal protection clause focuses judicial attention upon legislative and administrative classifications. "[S]tatutes characteristically classify; that is, they do not apply universally." (Tribe, American Constitutional Law (1978) p. 994, fn. 21.) Accordingly, nearly every statute or policy promulgated by the legislative and executive branches of government is subject to judicial approval under the mandate of our Constitution's equal protection clause.

It is generally recognized that the legislative and executive branches should make most of these substantive classification decisions. The role of the judiciary is to carry out those decisions, not to substitute its judgment on such matters for that of either of the co-equal branches.[1] The equal protection clause contains the potential to overwhelm this basic principle since it can be invoked to review all classification schemes, i.e., nearly all governmental laws and policies. This potential has not materialized because courts have traditionally applied a " *'restrained'* equal protection

---

[1]The judiciary occasionally plays a more active role as, for example, when it is called upon to determine whether a legislative (or administrative) scheme complies with the state or federal Constitution. However, this active role cannot justify the use of the equal protection clause proposed by Justice Mosk since a consistently active application of that constitutional provision will lead to the exception of judicial intervention swallowing the rule of judicial restraint.

standard of review" to most classifications. (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 847 [148 Cal.Rptr. 148, 582 P.2d 604], italics added.)

I see no principled way to prevent the new intermediate level test, as set forth in Justice Mosk's concurrence, from undermining this restraint and replacing it with a test that invites extensive judicial intervention into matters that have been the primary responsibility of the other branches of government. Under Justice Mosk's formulation, the intermediate level of review is appropriate "when rights important—but not 'fundamental' —are denied, or when a classification sensitive—but not 'suspect'—is made." (Conc. opn. of Mosk, J., *ante,* at p. 601.) Scarcely any legislative enactment can fail to give rise, at the very least, to this level of scrutiny. Rarely can it be said that the Legislature has passed a law which deals in "unimportant" rights and nonsensitive classifications. Indeed, the fact that a law is enacted strongly suggests the *Legislature* considers it to be "important."

Once the preconditions of the intermediate level test are satisfied, the judiciary becomes entitled—indeed, is *required*—to exercise an enormous power: to determine whether the state interests involved are "important" and, if so, whether the legislation "significantly" advances those interests. (Conc. opn. of Mosk, J., *ante,* at p. 601.) Since the key terms of the proposed test are inherently subjective and vague,[2] the judiciary is empowered under the equal protection clause to exercise a veto power over almost any legislation. This, despite the fact the court may be ill equipped to make the types of political decisions which many legislative classification schemes entail. Essentially, Justice Mosk would reinstate the "excessive judicial intervention" of the "substantive due process" years, which he elsewhere purports to condemn. (Conc. opn. of Mosk, J., *ante,* at p. 596.)

A concomitant effect of this "sliding scale" approach is the weakening of the truly fundamental principles now encompassed in the "strict

---

[2]The "strict scrutiny" level of review under the current two-tier equal protection scheme involves "fundamental" rights, "suspect" classifications, and "compelling" state interests, i.e., terms which, in the abstract, may be only slightly more informative than "important," "sensitive," or "significant."

The strict scrutiny test, however, evolved from more concrete notions from which its application in a particular case could be derived. Those notions involved "more searching judicial inquiry" where legislation dealt with "those political processes which can ordinarily be expected to bring about repeal of undesirable legislation" or where the legislation affected "discrete and insular minorities." (*U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152-153, fn. 4 [82 L.Ed. 1234, 1241-1242, 58 S.Ct. 778].) There is no analogous underlying concept set forth in Justice Mosk's opinion which might reasonably limit the new test.

scrutiny" test of equal protection analysis.[3] As one scholar has noted, a sliding scale "could only produce more slide than scale." (Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 394.) "There may well be situations . . . in which the appropriate level of scrutiny is indeed strict rather than intermediate, and in which the availability of the 'middle tier' serves to divert pressure that might otherwise develop for strict review." (Tribe, *supra,* at p. 1089.) The present case provides an excellent example of the perceptiveness of these commentators. Although the rights involved here *are* fundamental, under Justice Mosk's concurrence this issue would be decided using a less stringent method of analysis. I seriously question whether any of these rights could ever escape the amorphous classification in which he would "temporarily" place them.

The concurrence does not address the fundamental issues underlying this new approach, and the justifications advanced are unpersuasive. A new tier is created under the authority of our state Constitution, but no need for it is shown under state law. Rather, the concurrence demonstrates, at most, an alleged "analytical lacuna" in the *federal* constitutional approach. (Conc. opn. of Mosk, J., *ante,* at p. 598.) However, our state equal protection clause is "possessed of an independent vitality" from the Fourteenth Amendment. (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) As the concurrence admits, this court has "exercised independence in our application of the state equal protection clause, finding rights to be fundamental [citation] and classifications to be suspect [citations] where the United States Supreme Court has declined to do so." (Conc. opn. of Mosk, J., *ante,* at p. 600.) The "glacial rigidity" which the concurrence finds in the federal scheme (*id.,* at p. 602) can scarcely be a criticism applicable to this court's rulings.[4] It is

[3] I accept Justice Mosk's premise that he is creating a new, distinct "tier" of equal protection review. However, within the middle tier, he creates a "sliding scale" approach under which all "important" rights and "sensitive" classifications are accorded different weights according to their "character" and "relative importance." (Conc. opn. of Mosk, J., *ante,* at p. 601.) Were it not for the stated premise, the new approach would more logically be seen as a *replacement* of the traditional tiered equal protection analysis with a complete sliding scale approach rather than a *refinement* of the existing analysis. However, a three-tiered format can itself be considered a limited sliding scale approach.

[4] See, e.g., *Cooper* v. *Bray, supra,* 21 Cal.3d 841, 847-848 (automobile guest statute applied to owner-passenger); *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254] (discrimination against rehabilitated misdemeanant sex offenders); *In re Kapperman* (1974) 11 Cal.3d 542, 545 [114 Cal.Rptr. 97, 522 P.2d 657] (preconviction jailtime credit); *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19, 24 [112 Cal.Rptr. 786, 520 P.2d 10] (osteopathic license law); *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861-862 and fn. 2 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505] (automobile guest statute); *Hayes* v. *Superior Court* (1971) 6 Cal.3d 216, 223 [98 Cal.Rptr. 449, 490 P.2d 1137] (discrimination against out-of-state prisoners regarding speedy

a nonsequitur to conclude that our state Constitution needs an intermediate level of scrutiny simply because the federal Constitution does.[5]

At this point, I am not convinced of the need for or the wisdom of a middle level of equal protection analysis under the California Constitution. I am convinced that this present case would afford a wholly inappropriate vehicle to set forth that new judicial policy. Since the result reached in this case is correct for the reasons expressed in the majority opinion, I join with my colleagues who have signed the majority opinion.

**RICHARDSON, J.**—I respectfully dissent. My disagreement with the majority is twofold: (1) the grand jury's indictment procedure as presently used in California is expressly authorized by our state Constitution which also vests in the California Legislature the exclusive power to abolish or amend the procedure; and (2) even if we possessed the authority to modify the present grand jury system, no invidious discrimination or inequality exists which would mandate the postindictment hearing procedure fashioned by the majority.

### 1. No Judicial Power to Amend Indictment Procedure

There is a preliminary issue barely explored by the majority: Do we possess the authority under the California Constitution to invalidate the existing procedures and to amend them by providing indicted defendants with a postindictment preliminary examination on demand? I think not. It is my premise that the present indictment procedures are necessarily constitutionally valid, because they are the product of legislative choice pursuant to an express constitutional grant. In short, the state Constitution expressly empowered the Legislature to create the existing system. It follows that courts, including this one, lack authority to destroy the system.

---

disposition of pending criminal charges); *In re Gary W.* (1971) 5 Cal.3d 296, 303-304 [96 Cal.Rptr. 1, 486 P.2d 1201] (involuntary commitment of juvenile court wards).

[5] In his concurrence, Justice Mosk points out that the federal intermediate level analysis is supported primarily by the Supreme Court's rulings in gender-based discrimination cases, for that court has not seen fit to subject sexual discrimination to strict scrutiny. Professor Tribe, on whose writings Justice Mosk relies heavily, suggests the Supreme Court may have erred in this respect and underclassified gender-based discrimination. (Tribe, *supra*, at p. 1089.) This court has agreed with Tribe's reasoning as applied to the California Constitution. (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; see also *Hardy* v. *Stumpf* (1978) 21 Cal.3d 1, 7 [145 Cal.Rptr. 176, 576 P.2d 1342].) Thus, the need for an intermediate level analysis under the California Constitution at this time is virtually nonexistent.

In September 1878, when the delegates first met in the Assembly Chamber of the State Capitol in Sacramento to frame a new Constitution, they were faced with the controversial task, among others, of determining the future role which the grand jury would play in criminal prosecutions. The 1849 Constitution had recited that "No person shall be held to answer for a capital or otherwise infamous crime, . . . unless on presentment or indictment of a Grand Jury; . . ." (Art. I, § 8.) By 1878, a procedure had developed whereby the accused was first examined by a magistrate and, if not ordered discharged, was then held awaiting a grand jury hearing and indictment. (*Kitts* v. *Superior Court* (1907) 5 Cal.App. 462, 465 [90 P. 977]; see 1 Cal. Constitutional Convention (1880) Debates & Proceedings, pp. 310, 313.) At the constitutional convention, an amendment was proposed which would enable the Legislature to amend the existing indictment system and to provide for prosecution by information, following a magistrate's examination. (*Id.,* pp. 308-309.)

Several delegates spoke in favor of the total abolition of the grand jury system on the ground of various asserted abuses in its procedures; other delegates urged its preservation. (*Id.,* pp. 309-317.) Finally, delegate Freeman explained that the proposed constitutional amendment was not designed either to abolish or preserve the grand jury system, but to permit the people, through their elected representatives, to choose whichever system was deemed most desirable. As he stated, "I don't know that it is necessary that we should say here to-day in Constitutional Convention that the Grand Jury system is more of good or more of evil; but I think at least *the question is a debatable one that we can leave to the Legislature to discuss,* for them to have or not to have a Grand Jury, and let them prescribe, if they want a Grand Jury at all, what cases, and in what instances, cases should be considered by the Grand Jury." (*Id.,* p. 317, italics added.) Thereafter, delegate Shafter confirmed delegate Freeman's analysis, stating that "It is the proposition of the Judiciary Committee *that this whole matter be delegated to the Legislature . . . . It leaves the power of prosecution by indictment or presentment—information it is called here—to the discretion of the Legislature.* They can restore it as a whole and leave out the word 'information,' or they can follow out the plan indicated here, and prosecute by both indictment and information. . . . [¶] I trust this Convention will leave this matter where it belongs, where the people themselves, through their legislators, may have control of it." (*Id.,* p. 318, italics added.)

No further debate on the matter occurred and, as finally amended, the following constitutional amendment was adopted by the delegates on

May 7, 1879: "Offenses heretofore required to be prosecuted by indictment shall be prosecuted by information, after examination and commitment by a Magistrate, or by indictment, *with or without such examination and commitment,* as may be prescribed by law. A grand jury shall be drawn and summoned at least once a year in each county." (Art. I, § 8, italics added.)

No probing constitutional analysis is necessary to discern the plain meaning of the foregoing language, in light of the sequence of events at the constitutional convention: The *Legislature* was empowered to provide for the prosecution of criminal cases, either by information or by grand jury indictment. Prosecution by information was to occur following examination and commitment by a magistrate. However, prosecution by indictment could occur *"with or without such examination and commitment"* as the Legislature may provide. Quite plainly, then, the present legislative system of alternative prosecution procedures, including grand jury indictment without examination and commitment by a magistrate, was *expressly authorized by article I, section 8, of the California Constitution.* As stated in *Kitts* v. *Superior Court, supra,* 5 Cal.App. 462, "The effect of this provision of the constitution is, as may readily be seen, that an indictment by a grand jury may be found for a felony *without a preliminary examination of the charge by a magistrate,* . . ." (P. 465, italics added.)

It seems equally clear that, not only is the present grand jury system authorized by the state Constitution, but also that it is the Legislature, and not this court, which is vested with the *exclusive* power to alter or abort that system. We ourselves have explicitly acknowledged this. In *People* v. *Bird* (1931) 212 Cal. 632 [300 P. 23], we said that "It is apparent from these debates [leading to the adoption of former section 8] that there was a sharp conflict of opinion whether the power should be vested in the legislature to adopt either the grand jury system or prosecution by information. It was finally decided to continue the grand jury system and provide for the alternative method of prosecution by information preceded by an examination and commitment by a magistrate, *the procedure in either case to be left to legislative control."* (P. 643, italics added; accord *Fitts* v. *Superior Court* (1936) 6 Cal.2d 230, 241 [57 P.2d 510].)

In 1934, the people adopted a further amendment to section 8 of article I, preserving the language of the original section, quoted above, and adding various specific provisions implementing the basic provisions. In

1974, however, the voters approved a more simplified version of section 8, renumbering the provision as section 14, which provides in pertinent part as follows: "Felonies shall be prosecuted as provided by law, *either by indictment or, after examination* and commitment by a magistrate, *by information.*" (Italics added.) As the majority herein concedes (*ante,* p. 594) no change in meaning was intended by the 1974 amendment; the requirement of examination and commitment by a magistrate very clearly applies only to proceedings by way of information, not indictment. This conclusion regarding the intent of the 1974 amendment is confirmed by both the reports of the Constitution Revision Commission and by the ballot arguments presented to the voters before the November 1974 General Election.

The commission's preelection report observed that "Existing Section 8 contains extensive provision for criminal indictment procedures. . . . [¶] Indictment procedures are significant because they assure certain guarantees to all those accused of crimes. Although much of the procedural material in existing Section 8 is recommended for transfer to statutes, the Commission feels that *retention of some basic provisions is warranted and desirable.* [¶] . . . The entire grand jury system has many deficiencies which should be corrected. *The Commission believes that the Legislature is best equipped to reform this system* and that reform should not be hampered by unnecessary constitutional restrictions." (Cal. Const. Revision Com., Proposed Revision of the Cal. Const. (1971) pt. 5, p. 22, italics added.) Nowhere in the commission's report is any reference made to the issue now before us, namely, the validity of prosecution by indictment in the absence of a preliminary examination by a magistrate.

Similarly, in the official California voters pamphlet prepared for the November 1974 General Election, no mention is made of the indictment-preliminary examination issue. The pamphlet recites only that the proposed amendment "deletes from the Constitution . . . detailed rules of criminal indictment procedure . . ." since such matters are deemed "suited for *statutory* enactment." (Ballot Pamp., Gen. Elec. (Nov. 1974) p. 26, italics added.)

It therefore seems beyond legitimate dispute that, since 1879, the California Constitution has *expressly* authorized the present indictment procedure challenged in this case, and has vested in the Legislature the *sole* power to change that procedure. Four years ago the voters were told that this was exactly the result for which they were voting. I respectfully suggest that the majority's sole response to the foregoing point is wholly

inadequate. The majority, ignoring the constitutional history set forth above, merely observes that both new section 14 and former section 8 refer to indictment or information procedure "as provided by law." According to the majority, "The term 'law,' of course, encompasses judicial decisions as well as legislative enactments. (Cf. Evid. Code, § 160.) Thus, while the Constitution authorizes the use of grand juries to indict criminal defendants, it leaves to the Legislature *and the courts* the task of developing procedures, consistent with other state constitutional provisions, for implementing that mode of initiating prosecutions." (*Ante,* p. 594, italics added, fn. omitted.) The argument is ingenious, but invalid.

There are two obvious flaws in the majority's cursory analysis. First, as we have seen, the convention debates disclose that the purpose underlying the adoption in 1879 of section 8 was to permit the *people* of this state, *acting through the Legislature,* to decide whether, and to what extent, the grand jury system should be modified or replaced. None of the delegates indicated any intent whatever to authorize the courts in general, or this court in particular, to "equalize" the indictment and information procedures in the manner proposed by the majority herein.

Second, and contrary to the majority's assumption, the cases have uniformly held that the phrase "as provided by law" in a constitutional provision such as former section 8 and present section 14 ". . . look[s] to *actual legislation* upon the subject, and in no just sense can be extended to a permission of the exercise of this power to others." (*Exline* v. *Smith* (1855) 5 Cal. 112, 113, italics added; see *Gilliam* v. *California Emp. Stab. Com.* (1955) 130 Cal.App.2d 102, 115 [278 P.2d 528]; *Howard* v. *Cook* (1938) 59 Idaho 391 [83 P.2d 208, 210]; *McLavy* v. *Martin* (La.Ct.App. 1964) 167 So.2d 215, 221; *Lewis* v. *Florida State Board of Health* (Fla.Ct.App. 1962) 143 So.2d 867, 869; *State* v. *State Board of Land Commissioners* (1957) 131 Mont. 65 [307 P.2d 234, 236]; Black's Law Dict. (4th rev. ed. 1968) p. 1388.) While the majority relies exclusively upon the language of Evidence Code section 160, here again they are frustrated for that section affords them no support whatever. Section 160 is inapposite for it merely defines the word "law" as the term is used *in the Evidence Code.* (Evid. Code, § 100.)

Our *Exline* case, *supra,* involved a section of the state Constitution which authorized a waiver of jury trial as may be "prescribed by law." (Former art. I, § 3.) We held that the quoted phrase contemplated "actual legislation" and could not be construed as authorizing the courts to specify the conditions under which a waiver could be found to exist. In

the present case, especially in the light of the constitutional debates, we must likewise construe the language of section 14 (and former § 8) of article I as vesting *in the Legislature* the sole power to develop and alter the procedures for initiating a criminal prosecution.

To summarize, the majority has clearly erred in assuming that we are vested with a broad unlimited authority under the California Constitution to tack on new procedures for the implementation of the grand jury system. Although courts have general power under the equal protection clause of the state Constitution to find specific legislation invalid, that authority may not be extended to strike down a legislative scheme which has developed pursuant to a direct and express *constitutional* grant. We possess no right whatever to rearrange or refashion to our own liking the provisions of article I, section 14, in which the people have expressly said that an examination need *not* accompany the indictment.

The legislative intent on the subject of grand jury indictment procedure is readily ascertainable in the light of the recent defeat of two bills (Sen. Bill No. 815 and Assem. Bill No. 1777) which would have limited the grand jury's indictment function and extended the procedural rights of the accused in grand jury hearings. As I have explained, it was the clear intent of the framers of our Constitution that the controversial subject now before us ultimately be left in the hands of the people of this state, acting through their elected representatives. The majority's action today in removing the issue from the people's hands wholly frustrates that salutary purpose.

## 2. *No Denial of Equal Protection*

Even were we to assume, for purposes of argument, that this court has the power to impose a postindictment preliminary examination, contrary to the view expressed above, no good reason appears for doing so, as the present system operates in an entirely constitutional fashion. Indeed, prior to today's decision, we and other courts have uniformly so held. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 746-747 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Goldenson* (1888) 76 Cal. 328, 345 [19 P. 161]; *In re Wells* (1971) 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Pearce* (1970) 8 Cal.App.3d 984, 986-989 [87 Cal.Rptr. 814]; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 388 [87 Cal.Rptr. 394]; *People* v. *Rojas* (1969) 2 Cal.App.3d 767, 771 [82 Cal.Rptr. 862]; *People* v. *Flores* (1969) 276 Cal.App.2d 61, 65-66 [81 Cal.Rptr. 197]; *People* v. *Dale* (1947) 79 Cal.App.2d 370, 373-374 [179 P.2d 870].)

As we stated recently in *Sirhan,* "The use of indictments in all cases warranting serious punishment was the rule at common law [citation], and is required in certain federal prosecutions by the Fifth Amendment of the federal Constitution. It has long been the rule in this state, however, that felonies may be prosecuted by either indictment or information. [Citations.] Although there are differences between the two procedures, a defendant who is proceeded against by an indictment is not denied due process or equal protection. [Citations.] It similarly does not violate due process to initiate a prosecution by an information rather than an indictment. [Citations.]" (7 Cal.3d at pp. 746-747.)

The majority cites but a single out-of-state case as authority for the general proposition that defendants are entitled to a postindictment preliminary hearing. (*People* v. *Duncan* (1972) 388 Mich. 489 [201 N.W.2d 629].) Yet the *Duncan* court declined to place its decision on constitutional grounds, relying instead upon the court's inherent power to regulate criminal procedure. In California, however, such inherent powers may not be exercised to nullify existing legislation. (E.g., *People* v. *Municipal Court (Runyan)* (1978) 20 Cal.3d 523, 528 [143 Cal.Rptr. 609, 574 P.2d 425].)

Research has disclosed no state or federal court case holding, as the majority herein does, that a postindictment hearing is required as a matter of *constitutional* law. This is a wholly novel proposition. In fact, it is very evident that, under the federal Constitution, there exists no constitutional right to a preliminary examination. (See *Gerstein* v. *Pugh* (1975) 420 U.S. 103, 118-119 [43 L.Ed.2d 54, 67-68, 95 S.Ct. 854] [no probable cause hearing required unless pretrial confinement is sought]; *Beck* v. *Washington* (1962) 369 U.S. 541, 545 [8 L.Ed.2d 98, 104-105, 82 S.Ct. 955]; *Lem Woon* v. *Oregon* (1913) 229 U.S. 586 [57 L.Ed. 1340, 33 S.Ct. 783]; Fellman, The Defendant's Rights Today (1976) p. 43; Wharton, Criminal Procedure (1974 ed.) § 144, pp. 303-304 and cases cited.) Thus, the federal courts have uniformly held that a defendant in a criminal case is not entitled to a preliminary examination following a grand jury indictment. (*Harris* v. *Estelle* (5th Cir. 1974) 487 F.2d 1293, 1296; *United States* v. *Anderson* (4th Cir. 1973) 481 F.2d 685, 691; *United States* v. *Le Pera* (9th Cir. 1971) 443 F.2d 810, 811; *United States* v. *Conway* (3d Cir. 1969) 415 F.2d 158, 160-161.)

The majority relies upon *Coleman* v. *Alabama* (1970) 399 U.S. 1, 9-10 [26 L.Ed.2d 387, 396-397, 90 S.Ct. 1999], for the proposition that a preliminary examination is a "critical stage" of the prosecution process and thereby becomes one in

which counsel's presence is required. As pointed out in a recent federal case, however, "The import of *Coleman* is that once a state provides a preliminary hearing, counsel must be afforded at that hearing, not that such a hearing is a minimum requirement of Fourteenth Amendment due process." (*Harris* v. *Estelle, supra,* 487 F.2d at p. 1296.) Thus, although both the indictment and information procedures are directed toward determining whether probable cause exists to hold the accused, such a probable cause hearing is not constitutionally required to be formal or adversary in nature; the hearing is not necessarily a "critical stage" in the prosecution. (*Gerstein* v. *Pugh, supra,* 420 U.S. 103, 122-123 [43 L.Ed.2d 54, 70].)

In California, the preliminary examination has assumed an adversary character by reason of the direct confrontation between the accused and his accusers which occurs at the hearing. Accordingly, the accused is afforded a panoply of procedural rights, including right to counsel, right to confront, cross-examine and compel the attendance of witnesses, and right to present exculpatory evidence. Although these rights may be unavailable to the witness at a grand jury hearing, the differences in procedure are necessarily inherent in the well established differing functions of grand jury and magistrate. Although both the indictment and information procedures are aimed at determining the ultimate question whether probable cause exists to hold the accused for trial, the grand jury is a distinct *investigative* body, conducting its sessions in private, without public accusation, in accordance with procedural rules and safeguards (discussed below) deemed sufficient in light of the nonadversary nature of the proceedings. Grand jury hearings are not the equivalent of a criminal trial or pretrial hearing, nor were they designed as such. (See *United States* v. *Calandra* (1974) 414 U.S. 338, 342-344 [38 L.Ed.2d 561, 568-569, 94 S.Ct. 613]; *People* v. *Pearce, supra,* 8 Cal.App.3d 984, 987; *People* v. *Flores, supra,* 276 Cal.App.2d 61, 65-66; *People* v. *Dupree* (1957) 156 Cal.App.2d 60, 64-66 [319 P.2d 39]; Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, § 175, p. 167.)

Mr. Witkin, a widely recognized legal scholar, emphasizes the vital and critical distinction between the indictment and information proceedings: "The rule that the person under investigation is not entitled to appear or offer evidence is long established. It is based on the fundamental distinction between the investigatory and judicial functions: The grand jury is not a court, and its proceedings are not a criminal trial; hence the constitutional rights of confrontation of witnesses and production of

evidence do not apply until the subsequent trial on an indictment found." (Witkin, *supra,* p. 167.)

The Judicial Council of California observes that, among other advantages, by reason of its nonadversary nature grand jury hearings can eliminate substantial delays inherent in preliminary examination proceedings, especially in cases involving multiple narcotics purchases or other illegal transactions, multiple defendants (such as the present case), and complex fraud issues. (Judicial Council of Cal., Annual Rep. (1974) pp. 48-49.) Quite obviously, these benefits would be entirely lost if the accused were entitled to demand an adversary postindictment preliminary examination, thereby necessitating a complete "retrial" of the charges before a magistrate.

The United States Supreme Court in *Gerstein* v. *Pugh, supra,* 420 U.S. 103, 116-119 [43 L.Ed.2d 54, 66-68], held that no such adversary hearing is required, so long as the accused is afforded a "neutral" probable cause hearing independent of police and prosecution. In California, grand jurors are required by law to pledge their neutrality. (Pen. Code, § 911; see § 939.5.) Contrary to the majority's unwarranted accusation that the grand jury lacks independence and is dominated by the prosecuting attorney, we have stressed that "A grand jury's function is to return an indictment against a person only when the evidence presented to it indicates that he has committed a public offense. *It is no Star Chamber tribunal empowered to return arbitrary indictments unsupported by any evidence.* On the contrary the necessity of basing an indictment upon evidence is implicit in section 921 of the Penal Code . . . ." (*Greenberg* v. *Superior Court* (1942) 19 Cal.2d 319, 321 [121 P.2d 713], italics added.)

Moreover, grand jury proceedings contain additional safeguards against arbitrary action. In view of the serious consequences and possible harm to the accused's reputation if information regarding the grand jury's investigation were disclosed, its proceedings are conducted in total secrecy (Pen. Code, §§ 924.1-924.3, 939); every indicted defendant is entitled to a complete transcript of the proceedings (*id.,* §§ 938.1, 995a; *People* v. *Pipes* (1960) 179 Cal.App.2d 547 [3 Cal.Rptr. 814]); witnesses, including suspects, are protected by the privilege against self-incrimination (Evid. Code, §§ 930, 940); only evidence admissible at trial may be considered by the jurors (Pen. Code, § 939.6, subd. (b)); and the jurors are authorized to order additional evidence presented to them when they have reason to believe it will explain away the charge (*id.,* § 939.7).

Most importantly, under a recent decision of this court, the prosecution must inform the grand jury "of evidence reasonably tending to negate guilt." (*Johnson* v. *Superior Court* (1975) 15 Cal.3d 248, 255 [124 Cal.Rptr. 32, 539 P.2d 792].) Under *Johnson,* defense counsel may submit exculpatory evidence to the grand jury simply by first presenting such evidence to the prosecution. The foregoing safeguards, coupled, of course, with the fact that every defendant (1) may seek judicial review of the indictment (Pen. Code, §§ 995, 999a), and (2) is entitled to the full panoply of procedural due process rights at his trial, amply protect the indicted defendant from arbitrary or capricious action by either the prosecution or the grand jury itself.

The majority suggests that the preliminary examination serves an essential secondary function of providing the accused with pretrial discovery regarding the case against him. Yet the indicted defendant has adequate means of pretrial discovery. "In felony cases, the preliminary examination or grand jury hearing transcripts will ordinarily provide a valuable source of pretrial information. In addition, police reports and witnesses' statements are readily discoverable upon a proper showing of need. [Citation.] Furthermore, nothing ordinarily would prevent the accused from interviewing prosecution witnesses to ascertain their version of the events. [Citations.]" (*People* v. *Municipal Court* (*Runyan*), *supra,* 20 Cal.3d 523, 531.)

Despite the foregoing safeguards and benefits available to the indicted accused, the majority asserts that under the present system "a defendant charged by indictment is seriously disadvantaged in contrast to a defendant charged by information." (*Ante,* p. 592.) To the contrary, I would conclude on the basis of the numerous authorities cited above that the differences in the two procedures are matters which do not rise to the level of *unconstitutional* deprivations of equal protection of the laws.

For the foregoing reasons, I would deny the writ.

Clark, J., concurred.

The petition of the real party in interest for a rehearing was denied December 13, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.